**2015-1359**

# United States Court of Appeals
# For the Federal Circuit

JOHN H. STEPHENSON

*Patent Owner-Appellant*,

v.

GAME SHOW NETWORK, LLC, and WORLDWINNER.COM

*Petitioners-Appellees*.

*Appeal from the United States Patent and Trademark Office*
*Patent Trial and Appeal Board in No. IPR2013-00289*

**BRIEF OF PATENT OWNER-APPELLANT JOHN H. STEPHENSON**

Daniel W. McDonald
Thomas J. Leach
Rachel C. Hughey
Robert A. Kalinsky
MERCHANT & GOULD P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 332-5300

April 24, 2015

*Attorneys for Patent Owner-Appellant*

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, counsel for the Appellant John H. Stephenson, certifies the following:

1. The full name of every party or amicus represented by me is John H. Stephenson.

2. The names of the real party in interest (if the real party named in the caption is not the real party in interest) represented by me are:

   John H. Stephenson
   Leonard Anderson

3. All parent corporation and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:  N/A.

4. The names of all law firms and the partners or associates that appeared for the parties or amicus now represented by me in the trial court or agency of are expected to appear in this court are:

   Daniel W. McDonald
   Thomas J. Leach
   William D. Schultz
   Rachel C. Hughey
   Robert A. Kalinsky
   Christopher C. Davis
   Merchant & Gould P.C.
   3200 IDS Center
   80 South Eighth Street
   Minneapolis, MN 55402

   Adam W. Poff
   James L. Higgins
   Young Conaway Stargatt & Taylor, LLP

   Steven M. Harris
   Doyle, Harris, Davis & Haughey

Dated:  April 24, 2015                    s/Daniel W. McDonald

                                          Daniel W. McDonald

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ......................................................................i

TABLE OF CONTENTS.......................................................................... iii

TABLE OF AUTHORITIES .....................................................................vi

STATEMENT OF RELATED CASES .................................................ix

I.    STATEMENT OF JURISDICTION ..............................................1

II.   STATEMENT OF THE ISSUES .................................................2

III.  STATEMENT OF THE CASE ....................................................4

IV.  STATEMENT OF THE FACTS ..................................................7

      A.    Procedural History..............................................................7

      B.    The Invention Disclosed and Claimed in the '237 Patent....................8

            1.    The '237 Patent is Directed to Games Played Between a Player and a Host Computer—Not Playing Games Merely Administered by a Computer ......................................8

            2.    The Claims of the '237 Patent Require the Host Computer to Play the Game ........................................14

      C.    Walker Discloses a System that Administers Tournaments Between Human Players without the Computer Playing, and is Substantially Different From the '237 Patent's Claimed Inventions.......................16

      D.    The Board's Decision ........................................................18

            1.    The Board's Decision to Institute IPR and its Flawed Construction of "Playing … Between".......................18

　　　　2.　　The Board's Final Written Decision ...........................................21

V.　SUMMARY OF ARGUMENT ....................................................24

VI.　ARGUMENT .........................................................................27

　　A.　Standard of Review ........................................................27

　　B.　The Board Erred in Construing "Playing a Game Of Skill …
　　　　Between" to Mean the Host Computer at Least Administers the
　　　　Game ...............................................................................29

　　　　1.　　The Claims are Consistent With Using the Plain Meaning of
　　　　　　"Playing …. Between a Single Player and a Host
　　　　　　Computer" ..............................................................30

　　　　2.　　The Specification Supports the Plain Meaning of "Playing
　　　　　　Between" Requiring Both the Human Player and Host
　　　　　　Computer to Play the Game ......................................33

　　　　3.　　The Parties Agree that "Playing Between" and "Playing
　　　　　　Against" are Used Interchangeably in the Specification,
　　　　　　Supporting Stephenson's Construction .....................36

　　　　4.　　The Board's Construction Ignores the Claim Language,
　　　　　　the Specification and Applicable Claim Construction
　　　　　　Principles ................................................................38

　　　　　　i.　　The Board Erred by Ignoring the Plain Meaning of
　　　　　　　　"Playing" ...........................................................39

　　　　　　ii.　　The Specification does not Clearly Require
　　　　　　　　Deviating From the Plain Meaning of "Playing …
　　　　　　　　Between"; the Board did not Even Address this
　　　　　　　　Question..............................................................40

　　　　　　iii.　　The Board's Reliance on Dependent Claim 10 to
　　　　　　　　Support its Construction is Misplaced .................44

iv

iv.    The Board Erred in Disregarding the
Interchangeability of "Between" and "Against" as
Agreed by Both Sides' Experts ...........................48

C.    The Board Erred in Holding that Claims 1-19 are Unpatentable
Because of the Erroneous Construction of the "Playing … Between"
Element ........................................................48

1.    The Board Erred in Finding that Walker Anticipates Claims 1-
3, 5, and 8-19............................................49

2.    The Board Erred in Finding that Walker Renders Claims 4, 6
and 7 Obvious ...........................................50

VII.   CONCLUSION AND STATEMENT OF RELIEF SOUGHT ....................51

ADDENDUM ........................................................52

PROOF OF SERVICE ...............................................53

CERTIFICATE OF COMPLIANCE ......................................54

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*August Tech. Corp. v. Camtek, LTD,*
  655 F.3d 1278 (Fed. Cir. 2011) ........................................................36

*Consol. Edison Co. v. N.L.R.B.,*
  305 U.S. 197 (1938)...........................................................................29

*Ferguson Beauregard/Logic Controls v. Mega Systems,*
  350 F.3d 1327 (Fed. Cir. 2003) .........................................................28

*In re Abbott Diabetes Care, Inc.,*
  696 F.3d 1142 (Fed. Cir. 2012) .........................................................28

*In re Chuang,*
  No. 2014-1257, 2015 U.S. App. LEXIS 2222 (Fed. Cir. Feb. 10, 2015)...........29

*In re Cuozzo Speed Techs.,*
  778 F.3d 1271 (Fed. Cir. 2015) ...................................................27, 28

*In re Gartside,*
  203 F.3d 1305 (Fed. Cir. 2000) .........................................................29

*In re Suitco Surface, Inc.,*
  603 F.3d 1255 (Fed. Cir. 2010) ...................................................28, 29

*Invista N. Am. S.a.r.l. v. M&G USA Corp.,*
  951 F. Supp. 2d 604 (D. Del. 2013)...................................................38

*Kruse Tech. P'ship v. Volkswagen AG,*
  544 Fed. Appx. 943 (Fed. Cir. 2013)..................................................42

*Multilayer Stretch Cling Film Holdings, Inc. v. Interplast Group, Ltd.,*
  No. 2:12-cv-2107, 2013 U.S. Dist. LEXIS 160073 (W. Dist. Tenn. Nov.
  8, 2013) ..............................................................................................47

*North Am. Vaccine v. Am. Cyanamid Co.,*
  7 F.3d 1571 (Fed. Cir. 1993) .............................................................47

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ...................................................28, 30

*Primos, Inc. v. Hunter's Specialties, Inc.*,
    451 F.3d 841 (Fed. Cir. 2006) ...........................................................31

*Rexnord Corp. v. Laitram Corp.*,
    274 F.3d 1336 (Fed. Cir. 2001) ...................................................20, 43

*Tate Access Floors v. Maxcess Techs.*,
    222 F.3d 958 (Fed. Cir. 2000) ...........................................................38

*Tempo Lighting, Inc. v. Tivoli, LLC*,
    742 F.3d 973 (Fed. Cir. 2014) ...........................................................27

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
    135 S. Ct. 831 (2015)..........................................................................27

*Thorn Emi N. Am., Inc. v. Intel Corp.*,
    928 F. Supp. 449 (D. Del. 1996)........................................................46

*Thorner v. Sony Computer Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) .............................................33, 35, 41

*TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*,
    529 F.3d 1364 (Fed. Cir. 2008) .........................................................42

*Verdegaal Bros. v. Union Oil Co. of Cal.*,
    814 F.2d 628 (Fed. Cir. 1987) ...........................................................29

*Vitronics Corp. v. Conceptronic*,
    90 F.3d 1576 (Fed. Cir. 1996) .......................................30, 33, 35, 39

*Zircon Corp. v. Stanley Black & Decker, Inc.*,
    452 Fed. Appx. 966 (Fed. Cir. 2011)................................................34

## STATUTES

28 U.S.C. § 1295(a)(4)(A) ....................................................................1

35 U.S.C. § 6.........................................................................................1

35 U.S.C. § 102.....................................................................................2

35 U.S.C. § 102(b) ...............................................................................48

35 U.S.C. § 142 ......................................................................................1

35 U.S.C. § 103 ...........................................................................3, 29, 48

35 U.S.C. § 316(e) ................................................................................27

35 U.S.C. § 319 ......................................................................................1

**OTHER AUTHORITIES**

37 C.F.R. § 42.100(b) ...........................................................................27

37 C.F.R. § 90.3(a)(1) .............................................................................1

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5(a), Appellant John H. Stephenson ("Stephenson") certifies that there is no other appeal in this proceeding from the United States Patent and Trademark Office ("PTO") that was previously before this Court or any other appellate court.

Pursuant to Federal Circuit Rule 47.5(b), the Court's decision in this appeal may affect *John H. Stephenson v. Game Show Network, LLC. et al.*, No. 1:12-cv-00614-SLR (D. Del.), a district court action where the involved U.S. Patent No. 6,174,237 ("the '237 patent") is asserted.  The district court action has been stayed pending the outcome of the present IPR2013-00289 and this appeal.  (*See* A1481-83; A1484; A1486.)

## I.    STATEMENT OF JURISDICTION

The PTO Patent Trial and Appeal Board ("the Board") had jurisdiction over Game Show Network, LLC's and WorldWinner.com, Inc.'s (hereinafter "GSN") *inter partes* review Petition pursuant to 35 U.S.C. § 6.

On November 7, 2014, the Board issued its Final Written Decision in the *inter partes* review.  (A1.)  In compliance with 37 C.F.R. § 90.3(a)(1) and 35 U.S.C. § 142, Stephenson timely filed its Notice of Appeal on January 9, 2015 (A1478) and timely filed it with the Patent and Trademark Office on January 8, 2015.  (A1487.)

This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 319.

## II.     STATEMENT OF THE ISSUES

1.     The '237 patent claims and specification describe a game played between a single player and a host computer.  The specification contrasts a computer "playing" the game with a computer acting "as a game sponsor by keeping score, operating the game, monitoring the player's progress and to distribute awards when appropriate."  Nowhere does the specification describe the computer as "administering" a game.  The disputed claim language requires "playing a game of skill . . . between a single player and the host computer."  Did the Board err in construing the "playing a game" limitation to mean "at least administering" to thereby include a computer that merely administers a game but does not play it?

2.     All claims of the '237 patent require the "playing a game . . . between" limitation.  Properly construed, the disputed phrase "playing a game of skill . . . between" means "playing"—not "at least administering."  Did the Board err in finding that claims 1-3, 5, and 8-19 of the '237 patent are anticipated under 35 U.S.C. § 102 by Walker, which discloses a computer administering—but not playing—a game?

3.     All claims of the '237 patent require the "playing a game . . . between" limitation.  Properly construed, the disputed phrase "playing a game of skill . . . between" means "playing"—not "at least administering."  Did the Board

2

err in finding that claims 4, 6, and 7 of the '237 patent are obvious under 35 U.S.C. § 103 over Walker, which discloses a computer administering—but not playing—a game?

## III.   STATEMENT OF THE CASE

This appeal arises from an *inter partes* review ("IPR") instituted by the Board under the Leahy-Smith America Invents Act ("AIA").  Stephenson, the appellant, is the owner of the '237 patent.  Appellees GSN petitioned the Board to institute an IPR challenging the claims of the '237 patent.  The Board instituted the IPR and subsequently found all claims of the '237 patent unpatentable over a single reference—PCT International Publication No. WO97/39811 to Walker Asset Management, L.P.  ("Walker").

The Board's erroneous claim construction led it to conclude that the claims of the '237 patent were either anticipated or obvious over Walker.  The dispositive issue here is whether the Board erred in construing the claim phrase "playing a game of skill . . . between a single player and the host computer," which limits every claim of the '237 patent.  The Board construed that phrase to mean that the host computer "at least administers" the game—thus finding the term to include not just a player and host computer *playing* a game, but also where the computer *does not play at all*, but rather merely administers the game by, for example, keeping score.

Walker discloses an electronic tournament system in which a computer administers a tournament between remotely located players, such as by keeping score.  However, Walker does *not* disclose a computer system that *plays* a game.

4

The Board's unreasonably broad construction captured Walker and led to the Board's legally-erroneous unpatentability decision.

The Board arrived at this overbroad construction by applying the wrong claim construction methodology. The Board did not first determine the plain meaning of the disputed claim language in view of the specification, including "playing" and "between." It did not look to the intrinsic evidence to see if the inventors clearly and unambiguously changed that plain meaning. Rather, the Board bypassed the plain-meaning analysis and started from an overbroad construction proposed by GSN based not on the intrinsic record regarding Stephenson's patent, but rather on GSN's desire to find the claims broad enough to read on a prior art patent. The Board then, again following GSN's lead, determined whether the specification could be reconciled with this manufactured, overbroad scope. The Board further erred by finding support for this overbroad construction based on the erroneous premise that the claim *must* include within its scope multiple possible embodiments of the invention as described in the specification, regardless of whether such a construction significantly deviates from the plain meaning of the claim terms used to define the invention. The Board ignored that the plain meaning of "playing a game…between" was consistent with the specification and the claims, and thus there was no reason to deviate from that plain meaning.

The Walker reference does not render the claims of the '237 patent unpatentable if "playing . . . between" does not include merely "administering" a game.  Indeed, GSN did not advocate that Walker taught or suggested "playing . . . between" under Stephenson's proposed construction, nor did the Board so find. Therefore, the Board's decision should be reversed because under the correct construction, all claims of the '237 patent are patentable.

## IV.   STATEMENT OF THE FACTS

### A.   Procedural History.

Stephenson owns and operates a gaming website that competes with GSN.
Stephenson's website is www.megadollargames.com.  GSN operates
www.worldwinner.com, which also provides internet games.  Stephenson sued
GSN for infringing his '237 patent on May 17, 2012.  Based on a stipulation, the
court stayed the lawsuit pending the outcome of the IPR proceeding, including this
appeal.

On May 17, 2013, GSN filed a Petition for IPR requesting the Board cancel
all claims of the '237 patent.  (A36.)  Stephenson filed a preliminary response
which disputed the broad constructions proposed by GSN.  (A326-29.)  The Board
essentially adopted GSN's proposed constructions and instituted Trial as to all
claims of the '237 patent on November 19, 2013, relying exclusively on the
Walker reference.  (A365.)  The Board instituted the IPR under two grounds: (1)
that Walker anticipates claims 1-3, 5 and 8-19 and (2) that Walker renders obvious
claims 4, 6, and 7.  (*Id.*)  These are the only two grounds for which the IPR was
instituted and are the only grounds on appeal.

Stephenson again disputed the claim construction in its Patent Owner
Response filed February 3, 2014.  (A407-09.)  On November 7, 2014, the Board
issued its Final Written Decision finding unpatentable claims 1-19 of the '237

7

patent, using the same claim construction used in the decision instituting Trial.

(A7-11.)  Stephenson timely appealed.  (A1478.)

## B.     The Invention Disclosed and Claimed in the '237 Patent.

### 1.     The '237 Patent is Directed to Games Played Between a Player and a Host Computer—Not Playing Games Merely Administered by a Computer.

The background of the '237 patent acknowledges that the prior art includes games of skill or tournaments involving computers.  (A31, Col. 1:25-28.) However, it notes there "is a need for a tournament which allows for a player to compete and obtain a reliable index as to his skill as compared to other competitors competing under the same game conditions while simultaneously enjoying the game."  (*Id*., Col. 1:59-63.)  The '237 patent notes a "need for a gaming format which allows a player to gauge the level of skill he posses[es] as compared to other players."  (*Id*., Col. 1:28-32.)  Stephenson recognized the need for a tournament method that could measure a player's skill independent of the variation caused by other human players, allow a player to play anytime without waiting for another human opponent, and reduce the potential for fraud on the game while still capturing the thrill of competition.

The '237 patent solves these and other problems.  It discloses a computer-based tournament system that pits a human player against a host computer opponent in a qualifying round to determine the human player's level of skill

8

objectively, rather than relative to or affected by another human opponent.  (A29, at Abstract ("In the qualifying round, a player competes against a host computer"); A476, ¶ 14.)  GSN's expert, Dr. Whitehead, agreed that the '237 patent discloses a computer playing head-to-head against a human in a game of skill.  (A555, 104:1-7.)  It allows players to obtain reliable measures of their skill.  (A475-76, ¶ 13.)  GSN's expert, Dr. Whitehead confirms that is how one of skill in the art would understand the '237 patent.  (A558, at 114:13-115:1.)  In the qualifying round, each player is also able to participate "at the time of their choosing" prior to a closing time.  (A33, Col. 5:13-16.)

The player's score is evaluated in this qualifying round, and the player is classified into a predetermined level of performance that matches his or her results.  (A476-77, ¶ 15; A32, Col. 3:66-4:5; *see also* A32, Col. 3:15-17 ("At least one player participates in the qualifying round 20 against a host computer.").)  Figure 1 illustrates an example tournament according to the invention where a player competes against a host computer and is classified into a level of performance independent of other players:



(A30, Fig. 1 (highlighting added).)

Figure 1 of the '237 patent shows that a player competes in a game of skill ("GOS") versus a host computer in box 22.  (*Id*.)  The system analyzes the player's results at box 24.  (*Id*.)  Based only on that player's results, the system determines (at diamond 26) if the player meets predetermined criteria to classify him or her in

a predetermined level of performance. (*Id.*)  If a player is classified into an

appropriate level of performance, an award is distributed to her at box 32.  (*Id.*)

The Summary of the Invention describes three functions of the host

computer, (1) acting as a computer opponent, (2) acting as a game sponsor by

keeping score, etc., and (3) providing additional players if needed:

> Examples of games of skill include but are not limited [to] chess,
> poker, bridge, hearts, blackjack and question/answer trivia games.
> The game of skill tournament is divided into two distinct portions: the
> qualifying round and the playoff round.  The qualifying round is played
> between a single player through a computer terminal and a host computer.
> The host computer has the ability to act as a game sponsor by keeping score,
> operating the game, monitoring the player's progress and to distribute
> awards when appropriate.  Also, the host computer has the ability to act as
> another player if the game requires more than a single player.

(A31, Col. 2:11-21.)

The Summary of the Invention explains that the "qualifying round is played

between a single player and a host computer."  (*Id.*, Col. 2:2-3.)  If that *single*

human player, in the qualifying round, "satisfies a predetermined criteria specific

to a level of performance, the player would then be classified a player of that

level."  (*Id.*, Col. 2:32-36 (emphasis added).)  The player is classified into a level

of performance by the single human player's competition against a host computer

opponent in the qualifying round.  (*Id.*, Col. 2:2-3 ("the qualifying round is played

between a single player and a host computer"), 2:32-36 (qualifying round

performance determines level of performance classification).)

11

The Summary of the Invention discloses a second function of the host computer—"to act as a game sponsor by keeping score, operating the game, monitoring the player's progress and to distribute awards"—in addition to acting as a player opponent. (*Id.*, Col. 2:14-19.) Nowhere in the '237 specification does it use the word "administering."

The system described also determines, based on predetermined criteria, whether the level of performance obtained in the qualifying round is sufficient to qualify the player to play in a playoff round. (*Id.*, Col. 2:2-5; A477, ¶ 18.) In the playoff round, the player will play against a host computer and her score—for the first time—will be compared to others in the playoff round to determine a playoff winner and player rank. (A33, Col. 5:33-58.) In the playoff round, players play the game of skill against the host computer simultaneously along with other players playing the game of skill against the host computer under the same game conditions. Their scores are compared to determine a winner and subsequent ranking. (A31, Col. 2:38-54; JA0478, ¶¶ 19-20.)

Having a single human player compete against a host computer in a qualifying round to determine skill independent of other human players playing against the host computer is a significant advancement over the prior art. (A478-79, ¶ 21.) The claimed invention's computer opponent acts as a "control" because it provides a consistent opponent response to each player's like play. (*Id.*) This

method increases reliability and consistency and decreases the uncontrolled variables and risk of fraud for player evaluations that are otherwise inherent in evaluations based on human players playing against one another.  (*Id*.)

This novel method for playing a game of skill tournament addresses the need for a tournament which allows a player to "obtain a reliable index as to his skill as compared to other competitors competing under the same game conditions."  (A31, Col. 1:59-62; *see also* A29, at Abstract ("method for a game of skill tournament that is challenging and also provides the player a reliable gauge of his skill level as compared to other players."); A31, Col. 2:43-45 (". . . play the game of skill against the host computer under the same rules and conditions . . .").)  This provides an improved system for determining a player's skill by removing the variables, inconsistencies, and opportunities for fraud caused by human opponents.  (A479, ¶ 21.)  Moreover, because the host computer can be available for play at the player's convenience (unlike another human player), players are able to participate "at the time of their choosing" in the qualifying round.  (A33, Col. 5:13-16.)

Stephenson's invention took a novel approach that reduces the opportunity to manipulate results.  The invention contrasts with tournaments in which human players play against other human players in a qualifying round.  In the qualifying round against the computer opponent in Stephenson's system, once players reach the top level of performance they do not have to continue playing the game.  (A32,

Col. 3:63-65.) It provides a reliable index as to a player's performance by removing the relativistic human element from the evaluation of the performance, it reduces collusion among players, and it is scalable both in terms of players and various skill levels. (A478-79, ¶ 21.) In Stephenson's invention there can be any number of skill levels to allow the system to more closely match players of like skill level and enhance competition while reducing cheating.

Because awards are involved, human players have an incentive to "game" the system whether for their own benefit or to benefit a collusive partner. A computer opponent, however, does not have such incentives. By eliminating the second human player from the qualifying process, the opportunities for fraud are reduced accordingly. (*Id.*; *see also* A581, at 206:10-16 (GSN's expert admitting that this human-to-computer competition reduces cheating).)

### 2. The Claims of the '237 Patent Require the Host Computer to Play the Game.

The '237 patent has nineteen claims. (A33-34.) Claim 1 is the only independent claim. (*Id.*) Claim 1 of the '237 patent is reproduced below with the main disputed language highlighted in bold:

> A method of playing a game of skill tournament having a qualifying round and a playoff round, and played over an interactive computer system, said interactive computer system having a host computer system, a plurality of terminals computers and compatible software, said method comprising the following steps:

14

a. **playing a game of skill in a qualifying round between a single player and the host computer**;

b. evaluating the results of said qualifying round to determine if said player qualifies to be classified within a specific performance level from a plurality of performance levels ranging from a low performance level to a high performance level;

c. evaluating the results of said qualifying round to determine if said player qualifies to be classified within a qualifying performance level taken from said plurality of performance levels;

d. distributing to said player a performance level award, said performance level award being dependent upon the specific performance level obtained;

e. playing said game of skill in a playoff round between said player and the host computer simultaneously along with other players, wherein each player has been classified within a qualifying performance level;

f. evaluating the results of said playoff round to determine a tournament winner and subsequent ranking of players; and

g. distributing tournament awards to tournament participants.

(A33, Col. 5:66-6:28 (emphasis added).) The claims call out that the computer system performs "evaluating" and "distributing" steps, separately from the steps involving "playing." The claim does not refer to "administering."

Dependent claim 10 lists over 40 generic card games. (*Id.*, Col. 6:56-64) The only game in claim 10 that GSN alleged was a single player game was solitaire. (A54-55.) The experts agreed that solitaire can also be a two player game. (A492, ¶ 58; A557, at 112:9-14; *see also* A1376-77 ("any solitaire may be played as a competitive game among two or more persons.").)

15

**C.     Walker Discloses a System that Administers Tournaments Between Human Players without the Computer Playing, and is Substantially Different From the '237 Patent's Inventions.**

The Walker reference discloses a different tournament system than the inventions claimed in the '237 patent.  Walker explains that its system, unlike pre-existing tournament systems, "allows for the coordination of multiple tournaments, making each tournament part of a whole rather than a stand-alone individual event."  (A106.)  Walker addressed the problem of expert players entering the same game to monopolize the top prizes.  (A104.)  Walker discloses a tournament system where the computer administers the tournaments between human players playing games against one another, such as by keeping score, receiving fees, and tracking player information.  (A106.)

Walker is directed to competition between human players, noting that each player receives a unique identifier that "allows other players to know whom they are competing against."  (*Id.*; A113-15 ("Each game session is further broken down into one or more challenges, which are the puzzles, trivia questions, *or games in which the players compete*." (emphasis added).)  In Walker the database can store information about a player's favorite (human) opponents.  (A113.)

The computer in Walker sponsors or administers game play, such as by keeping score, but does not act as an opponent.  (A109 (citing only administrative functions of Walker's computer system).)  Walker does *not* disclose that the host

16

computer plays the game in any context, let alone by playing against a human opponent in a qualifying round. (A109 (Walker's "software applications include programs for running the tournament games, registering players, accepting entry fees, and coordinating prize payments); A502, ¶ 78.) The tournament begins and ends within a fixed time window. (*Id*.) After each tournament, the system evaluates player performance. (*Id*.) Typically, the pre-established performance level is a relative ranking among players, such as the top five scores of the tournament. (A113.)

In the qualifying round, Walker discloses that a player's score is "compared to the scores obtained by all of the other players in the same session" and "[b]ased on these scores, the central controller produces a list of those participants qualifying for the subsequent session." (A114.) This allows players to game Walker's systems. For example, Walker's handicapping system faces problems when administered as a tournament over a distributed network. Players can create fake user names and register for tournaments without an established handicap. (A501-02, ¶ 77.) This allows an unscrupulous player to fabricate a handicap higher than his or her true handicap and unfairly compete against players of much lower skill. (*Id*.) It also allows players to conspire with other players to manipulate results, such as by helping another player to qualify for a tournament by deliberately losing to him or her. Walker discloses a computer-based

tournament system and database that more easily and accurately implements an old way of accounting for differences in players' skill levels in traditional human-versus-human competition.  (A501-02, ¶ 77; A516, ¶ 109.)

Walker is directed to competition between human players.  Walker addresses certain problems that arise from humans playing humans, such as tracking handicaps and reserving a spot for a player.  (A104.)  Nothing in Walker describes or suggests any benefit to, or reason for, players competing against a computer opponent.

### D.    The Board's Decisions.

#### 1.    The Board's Decision to Institute IPR and its Flawed Construction of "Playing . . . Between."

The Board instituted IPR of the '237 patent on November 19, 2013.  (A345.) In that decision, the Board construed the disputed phrase "playing a game of skill . . . between a single player and the host computer."  (A350-53.)  GSN argued that "claim 1 covers single-player games administered by a host computer and does not require head-to-head competition between the single player and the host computer."  (A350.)  The Board adopted GSN's position and construed the disputed phrase as follows: "playing a game of skill…where the game includes only one human player and is at least administered by a host computer."  (A353.)

Stephenson argued "that claim 1 requires the host computer to play the game, not merely administer the game."  (A350.)  Stephenson argued that the

disputed phrase means "playing a game of skill . . . where a single human player plays against a host computer." (A327.) While the Board acknowledged that the '237 patent uses "between" and "against" interchangeably and that the specification describes, as examples, games of skill that require the computer to compete, by playing the game of skill, against the human player (A9), the Board rejected Stephenson's proposed construction (A7).

GSN's construction adopted by the Board did not focus on the claim language. Indeed, "administer" is not used anywhere in the specification or claims. Instead, the Board cited portions of the specification cited by GSN that describe the "host computer as having the ability to act as 'a game sponsor by keeping score, operating the game, monitoring the player's progress and to distribute awards when appropriate.'" (A350-51.) The Board adopted GSN's position that this language is analogous to "administering" a game. (A351.) The Board noted that the specification describes the host computer as additionally having the "'ability to act as another player if the game requires more than a single player.'" (*Id.*) Again adopting GSN's position, the Board reasoned, "the computer sponsors or administers the game by keeping score, operating the game and monitoring progress, etc., and, if needed, it can act as another player." (*Id.*)

The Board also found, as GSN argued, that "the specification of the '237 patent provides that not all 'games of skill' require two players." (*Id.*) Using

solitaire (one of about 40 games listed in dependent claim 10) as an example, the

Board determined that solitaire is a "single player game with no head-to-head

competition, or second player, involved." (*Id.*) The Board reasoned, "for single-

player games, such as solitaire, the host computer would not act as another player,

but would administer the game." (A351.) The Board cited *Rexnord Corp. v.

Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001), which stands for the

proposition that the use of a term in one claim may illuminate the meaning of the

*same term* in other claims. (A351-52.) However, the Board did not identify any

such "same term" used in both claims 1 and 10 to support its construction. (*Id.*)

The Board's analysis followed GSN's analysis in its Petition, which never

proposed the plain and ordinary meaning of the disputed claim phrase. (*Compare*

A54-55 with A350-53.) GSN and the Board instead relied on the same two

sentences in the specification and solitaire's inclusion as one of over forty generic

card games listed in dependent claim 10, finding that they were consistent with the

disputed claim language broadly covering the host computer administering—rather

than playing—the game. (*Id.*) The Board concluded that "the proper claim

construction of that disputed phrase ["playing . . . between a single player and the

host computer"] is one that is broad enough to include single-player game playing,

in which case the host computer administers, but is not required to play the game

of skill." (A352.)

20

## 2.     The Board's Final Written Decision.

Stephenson maintained his construction of the "playing . . . between" limitation in his Patent Owner's response.  (A407-13.)  Indeed, that was his primary response to the Petition.  The Board issued its Final Written Decision on November 7, 2014, finding claims 1-19 of the '237 patent unpatentable.  (A1-2.) The Board adopted its earlier construction of "playing a game of skill . . . between a single player and the host computer."  (A7 ("We are not persuaded that our original interpretation should be modified.").)

The Board acknowledged that "claim 1 requires playing a game of skill *between* a single player and the host computer."  (*Id.* (emphasis in original).)  The Board found that "between" means "by the common action of: jointly engaging." (*Id.*)  The Board did not analyze the plain meaning of "playing."  Rather, the Board found that "play" means at least administer: "a *computer can 'play' by administering the game*, e.g., by keeping score, operating the game, and monitoring the player's progress."  (A8 (emphasis added).)

The Board supported its adoption of GSN's broader construction of claim 1 by arguing that it captures *all forms of* each of the over 40 generic card games listed in dependent claim 10 and described in the specification.  (A8-11.)  Unlike in the decision instituting the IPR, the Board acknowledged that solitaire in claim 10 includes two-player versions.  (A8.)  The Board thus admitted that its finding in the

decision instituting trial that solitaire is only a single player game was incorrect. Both experts agreed that there are versions of solitaire where two players compete head-to-head. (A492, ¶ 58; A557, at 112:9-14.) The Board dismissed the relevance of this fact, however, by finding that "'solitaire' is traditionally a single player game." (*Id*.)

The Board apparently placed a burden on Stephenson to prove that *all possible variations* of *each* of the 40 games listed in claim 10 were consistent with a construction of the "playing" limitation that excluded "administering." In other words, even though all 40 of the games listed in claim 10 are unquestionably multi-player games, the Board found that if even one of those games also had a single-player version, any construction of "playing" had to encompass that single-player version. It so found regardless of whether that construction was inconsistent with the plain meaning of the claim language or the disclosure of the invention in the specification. Specifically, the Board found that there is "nothing in the specification of the '237 patent that would have indicated to a person of ordinary skill in the art that Stephenson *intended to exclude traditional* single-player versions of games of skill." (A8 (emphasis added).) The Board supported its adoption of GSN's broader construction because that construction captured *every variant* (single-player and multi-player games) of *each* of the generic games listed in claim 10. (A9)

Both experts agreed that the terms "between" and "against" were interchangeable in the '237 patent specification. (A491; A585, at 224:20-225:4.) The Board nevertheless rejected Stephenson's argument that "between" and "against" are interchangeable in the claims. (A9.)

The Board relied on a few lines in the specification to support its broad construction. (A9-10.) It also relied on GSN's expert's interpretation of this specification language, not the claim language. (A9-11.) The Board found that this language disclosed two embodiments—single player games where the host computer sponsors the game and multiplayer games where the host computer plays. (A11.)

The Board ignored the language of the claims and unreasonably broadened the meaning to capture both embodiments when only one was claimed. The Board adopted GSN's arguments that these sentences were consistent with its determination that "playing" includes the computer "at least administering." (A10.) The Board did not address whether these sentences were also consistent with the plain-meaning construction of "playing" that Stephenson proposed, which excludes merely administering a game. Instead the Board found that "play a game . . . between" means "at least administer." (A11.)

Based on its construction of "playing a game . . . between," the Board determined that claims 1-19 were unpatentable over Walker. (A26-27.)

Specifically, the Board found that Walker anticipates claims 1-3, 5 and 8-19 and that Walker renders obvious claims 4, 6, and 7.  (*Id.*)

## V.    SUMMARY OF ARGUMENT

The Board erred in finding claims 1-19 of the '237 patent unpatentable based on its construction of "playing a game" to mean "at least administering a game."  The Board ignored the plain meaning of "playing" and construed "playing a game of skill . . . between a single player and the host computer" to include a host computer administering, but not playing, the game.  This was legal error.  This legal error led to the ultimate finding of unpatentability, because Walker admittedly only taught a host computer administering a game, not playing it, and GSN did not even argue that Walker invalidated the claims under Stephenson's proposed construction.

The Board erred by failing to first determine the plain meaning of the claim language and then turn to the other intrinsic evidence to determine if it contradicted the plain meaning.  Instead, the Board bypassed the plain meaning of "playing . . . between" and adopted GSN's broader construction of the term without any finding that the specification supported deviating from the plain meaning.  The Board then looked to whether it could reconcile the specification and claims with this *alternative* construction.  The result is a construction that is unreasonably broad and inconsistent with the plain meaning of the term.

24

Under the proper analysis, the disputed phrase requires both a human player and the host computer to do the same thing—play the game, not administer it. The plain meaning of play does not include administration, any more than someone would say a scorekeeper is playing a football or baseball game. The claims call out the computer performing administrative functions like "evaluating" results and "distributing" awards separately from the "playing" step, further confirming that "playing" does not include such functions. That should have been the starting point of the Board's analysis, but it was not.

Next, the specification and claims should be reviewed to determine whether they justify deviating from the plain meaning. Here, the specification and claims are readily reconcilable with the plain meaning of "playing between." The specification describes preferred embodiments where both the player and host computer play the game. It does this by contrasting "playing" with "sponsoring" activities, such as keeping score. Both parties and their experts agreed, and the Board found, that the specification discloses a host computer competing against human player. The specification explicitly states so: "in the qualifying round, a player competes against a host computer." (A29, Abstract.)

Nothing in the specification contradicts Stephenson's plain-meaning claim construction. Indeed, the term "playing" as used in the claims and specification has the same meaning as it applies to the human player and host computer, a

25

meaning that encompasses only "playing" in the ordinary sense.  Nowhere does the specification suggest that a human player keeps score or otherwise sponsors or "administers" the game.  That should have been the end of the construction analysis, with "playing . . . between" given its plain meaning that does not include merely administering a game.

The Board took a substantially different, erroneous approach.  Rather than look to whether it could reconcile the specification and claims with the *plain meaning*, the Board strained to reconcile the specification and claims with GSN's *special definition* of "playing . . . between."  This special definition adopts a construction of "playing . . . between" that includes a term *not even used* in the specification—"administering."  The Board also ignored a necessary result of its construction, unsupported by the specification, that a human player need not play the game at all.

There is no dispute that Walker does not disclose a host computer playing a game in the plain meaning sense.  In Walker the humans play and the computer administers.  Nor is there any finding that, under Stephenson's proposed construction of the "playing . . . between" limitation, the claims are anticipated or obvious in view of Walker.  GSN did not even so contend.  Thus, under the proper construction, Walker does not render any claim unpatentable.  The Board's

decision should be reversed and the claims of the '237 patent should be held patentable over Walker.

## VI.    ARGUMENT

### A.    Standard of Review.

The Federal Circuit "reviews the Board's legal conclusions de novo and its factual findings for substantial evidence." *Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 976-77 (Fed. Cir. 2014).  When reviewing the Patent Trial and Appeal Board's claim construction, the Federal Circuit "review[s] underlying factual determinations concerning extrinsic evidence for substantial evidence and the ultimate construction of the claim de novo."  *In re Cuozzo Speed Techs.*, 778 F.3d 1271, 1282-83 (Fed. Cir. 2015); *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 836-37 (2015).  Moreover, "when the district court reviews only evidence intrinsic to the patent (the patent claims and specifications, along with the patent's prosecution history), the judge's determination will amount solely to a determination of law, and the Court of Appeals will review that construction *de novo*."  *Teva*, 135 S. Ct. at 841.  GSN has the burden to show by a preponderance of the evidence that the claims of the '237 patent are unpatentable.  35 U.S.C. § 316(e).

The claim terms of the '237 patent are to be given their broadest reasonable construction in light of the specification in this proceeding.  37 C.F.R. § 42.100(b);

*In re Cuozzo Speed Techs.*, 778 F.3d at 1278-81. "Under a broadest reasonable interpretation, words of the claim must be given their plain meaning, unless such meaning is inconsistent with the specification." MPEP § 2111.01(I); *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005). That standard does not give the Board an unfettered license to interpret the claim terms inconsistent with the claims and the specification. *In re Abbott Diabetes Care, Inc.*, 696 F.3d 1142, 1148-50 (Fed. Cir. 2012) (finding the Patent Office's construction unreasonably broad because it was "unreasonable and inconsistent with the language of the claims and the specification."); *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1256 (Fed. Cir. 2010) ("The broadest-construction rubric coupled with the term 'comprising' does not give the PTO an unfettered license to interpret claims to embrace anything remotely related to the claimed invention.").

The Patent Office should determine the scope of the claims by giving them their broadest reasonable construction in light of the specification as they would be interpreted by one of ordinary skill in the art. *Phillips*, 415 F.3d at 1316. Moreover, it is the "use of the words in the context of the written description and customarily by those of skill in the relevant art that accurately reflects both the 'ordinary' and 'customary' meaning of the terms in the claims." *Ferguson Beauregard/Logic Controls v. Mega Systems*, 350 F.3d 1327, 1338 (Fed. Cir. 2003).

"Anticipation is a question of fact that is reviewed for substantial evidence." *In re Suitco Surface*, 603 F.3d 1255, 1259 (Fed. Cir. 2010). "A claim is anticipated only if each and every element as set forth in the claim is found . . . in a single prior art reference." *Verdegaal Bros. v. Union Oil Co. of Cal.*, 814 F.2d 628, 631 (Fed. Cir. 1987).

Obviousness under 35 U.S.C. § 103 is a question of law based on underlying facts. *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000). The Board's legal conclusion of obviousness is reviewed *de novo*; its factual findings are reviewed for substantial evidence. *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938); *In re Chuang*, No. 2014-1257, 2015 U.S. App. LEXIS 2222, at *2 (Fed. Cir. Feb. 10, 2015). "Substantial evidence is something less than the weight of the evidence but more than a mere scintilla of evidence . . . and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *In re Suitco Surface, Inc.*, 603 F.3d at 1259 (internal citations and quotations omitted).

**B.      The Board Erred in Construing "Playing a Game of Skill . . . Between" to Mean the Host Computer at Least Administers the Game.**

The Board's construction of the "playing a game . . . between" limitation, ensnaring the Walker reference, is unreasonably broad and contradicts the '237 patent's claim language and specification. The broadest reasonable interpretation

of this phrase, in light of the specification, is its plain meaning: "playing a game of skill in a qualifying round where a single human player plays against a host computer opponent." (A490, ¶ 53.) Because all of the claims require this limitation, this appeal turns on this construction. GSN agrees. (A1435, lines 6-10 ("If the panel resolves the claim construction issues that the parties have disputed, the case is essentially resolved.").)

### 1. The Claims are Consistent With Using the Plain Meaning of "Playing . . . Between a Single Player and a Host Computer."

The first step in construing claim language is to determine its plain meaning. *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "The ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of widely accepted meaning of commonly understood words." *Philips*, 415 F.3d at 1314. This is true of the language at issue here.

All claims of the '237 patent require "playing a game of skill . . . between a single player and the host computer." (A33, Col. 6:5-6.) Games of skill include games like chess, poker, bridge, hearts, blackjack, and question/answer trivia games. (A31, Col. 2:12-13.) These are all games that involve "playing" in the plain-meaning sense. The parties agree the term "between" should be given its

plain meaning, which is "by the common action of: jointly engaging." (A7; A343.) Thus, the language chosen by the inventor to describe and claim his invention dictates that both the human player and the host computer "jointly engage" in *playing* the game. The plain meaning of "play" is illustrated by its common usage. For example, a football game may be played between the Patriots and the Seahawks. The game is not played between the Patriots and the referees or the scorekeeper. Referees administer the game; players play. This shows that the plain meaning of play does not mean "at least administer" as playing and administering are two different acts. Indeed, the word "administer" does not even appear in the '237 patent.

The remainder of the claim language is consistent with the plain meaning of the "playing . . . between" phrase. Other elements in claim 1 require acts such as "evaluating the results" to determine qualification, and "distributing" a performance level award. (A33, Col. 6:7-16.) "Playing" thus presumptively means something different from "evaluating" results or "distributing" awards. *See Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 848 (Fed. Cir. 2006) ("[T]he terms 'engaging' and 'sealing' are both expressly recited in the claim and therefore 'engaging' cannot mean the same thing as 'sealing'; if it did, one of the terms would be superfluous."). Evaluating and distributing are examples of the computer administering the game, not playing it. Thus, the use of "playing . . .

31

between" in the claims is consistent with the plain meaning, and inconsistent with giving it a broader meaning.

The dependent claims further support this plain-meaning construction of "playing . . . between." Claim 9, for example, recites the "game of skill" as "a card game requiring skill and knowledge." (A33, Col. 6:53-55.) Claim 10 depends from claim 9 and lists about 40 generic games including poker, bridge, gin rummy, and cribbage. (A33, Col. 6:57-59.) The last game listed is solitaire. (*Id*., Col. 6:64.) Solitaire can be a one-player game but, as both experts and the Board acknowledged, may also be played in a competitive format involving two or more players. There was thus no dispute that *all 40 games* listed in claim 10 were games that can be played by at least two players using the plain meaning of "play." Thus, all claims of the '237 patent are consistent with the plain meaning of "playing a game . . . between."

Stephenson proposed that the broadest reasonable construction of "playing a game . . . between" is "playing a game of skill in a qualifying round where a single human player plays against a host computer opponent." As shown above, this proposed construction is consistent with the plain meaning of the phrase in the context of the claims.

## 2. The Specification Supports the Plain Meaning of "Playing . . . Between" Requiring Both the Human Player and Host Computer to Play the Game.

Once the plain meaning of a claim term is determined, then the specification is reviewed to determine whether the inventor used the term in a manner inconsistent with the claim's ordinary meaning. *Vitronics Corp.*, 90 F.3d at 1582. "In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term." *Id.* at 1583. The specification here discloses a human playing against the host computer, which is consistent with the plain meaning of "playing a game . . . between." Nothing in the specification compels changing the plain meaning of "play" to mean "at least administer."

As shown above, the plain meaning of "play" does not mean "at least administer" and claim 1 requires that both the human and host computer play the game. There are only two circumstances when the specification changes the plain and ordinary meaning of the claim language: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (citing *Vitronics*, 90 F.3d at 1580). Neither exception applies here. Both exceptions require a "clear and explicit statement by the patentee" to change the

ordinary meaning of the claim language, such as saying terms "are defined below." *Id*. at 1366-68.

While the specification *discloses* that a computer can "play" the game *or* act as a "sponsor," the first element of claim 1 *claims* a host computer playing the game.  Indeed, the word "administering" is nowhere to be found in the claim language or specification. Assuming that administering is analogous to sponsoring, then both words suggest keeping score, operating and monitoring the game. (A595.)  These sponsorship/administering words, however, are **contrasted** with **playing** a game between a player and a host computer, as the previous sentence states: "The qualifying round is *played between a single player through a computer terminal and a host computer*."  (A31, Col. 2:15-17 (emphasis added).) The fact that the inventor used different words for the different functions, namely "sponsoring" and "playing," highlights that the words mean different things.  *See Helmsderfer*, 527 F.3d at 1382; *Zircon Corp. v. Stanley Black & Decker, Inc.*, 452 Fed. Appx. 966, 978 (Fed. Cir. 2011).  The cited language from the specification supports the plain-meaning construction of "playing a game . . . between" a player and a host computer as *excluding* mere administration.  *Helmsderfer*, 527 F.3d at 1381-85 (courts do not rewrite claims or broaden or narrow claims to give a patentee something different than what was set forth, but instead give effect to the claim language chosen by the patentee).

34

Because the construction of the terms is clear from the *intrinsic* evidence, it would be improper to rely on *extrinsic* evidence to change the meaning. *Vitronics Corp.*, 90 F.3d at 1582. "In those cases where the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper." *Id*. at 1383. "Allowing the public record to be altered or changed by extrinsic evidence introduced at trial, such as expert testimony, would make this right meaningless." *Id*. Here the intrinsic record fully supports the plain-meaning construction and no resort to extrinsic evidence is appropriate.

The Board's reliance on expert testimony as to how one of skill in the art would understand sentences from the *specification* is irrelevant because the testimony was not directed to the *claim language*. (A10-11.) The analysis does not address the right issue: whether there is a clear and explicit statement in the specification that "playing" means "at least administering." The Board's reliance on extrinsic evidence that may show that the specification is consistent with its overbroad construction misses the issue. While this finding is wrong, even if it is accepted, it is irrelevant because it does not support using the specification to reject the term's plain meaning. The Board thus committed legal error. *See Thorner,* 669 F.3d at 1365-66 (stating that the specification can modify the plain meaning of a claim term when the patentee acts as her own lexicographer or disavows the full scope of the claim term).

The experts effectively dispute whether sentences in the specification disclose one embodiment (multiplayer games), or more than one (single player and multiplayer games). (A9-11.) That the specification might disclose two embodiments, one of which is unclaimed, is insufficient to change the plain meaning of the claim language. Here, the inventor claimed the multiplayer embodiment where the human and computer both play the game. An inventor is permitted to—and often does—disclose more than claimed. *See August Tech. Corp. v. Camtek, LTD*, 655 F.3d 1278, 1285 (Fed. Cir. 2011); *see also Helmsderfer*, 527 F.3d at 1383-84 (Fed. Cir. 2008). The expert dispute is thus irrelevant, and reliance on expert testimony to broaden the claim is error.

The specification supports Stephenson's construction that the plain meaning of "playing" should not be broadened to include merely "administering."

### 3. The Parties Agree That "Playing Between" and "Playing Against" are Used Interchangeably in the Specification, Supporting Stephenson's Construction.

Stephenson's proposed definition of the "playing . . . between" phrase recites that the human player and computer play "against" one another. The specification supports this construction for specific reasons. The specification makes clear that a human player competes against a host computer. (A29, at Abstract, (". . . a player competes against the host computer"); A31, Col. 2:39-42 (". . . he would be eligible to play the game of skill against the host computer in the

playoff round"); *id.*, Col. 2:43-45 (". . . play the game of skill against the host computer under the same rules and conditions . . ."); A32, Col. 3:15-19 ("At least one player participates in the qualifying round 20 against a host computer.").) More importantly for purposes of claim construction, the specification uses the term "against" interchangeably with "between," confirming that the host computer is not just playing the game, but playing the game *against* the human player. *Compare* A31, Col. 2:2-3 ("Generally, the qualifying round is played between a single player and a host computer.") *with* A32, Col. 3:26-28 ("The game of skill tournament first begins with at least one player playing a game of skill against the host computer in the qualifying round.").) The patent figures confirm this interpretation by stating that "Player Plays GOS vs. Host Computer." (A30, Fig. 1; A490-91, ¶ 56.)

Both experts agreed that in the '237 patent the terms "between" and "against" are used interchangeably. (A490-91, ¶ 56; A585, at 224:20-225:4 ("Q. Dr. Whitehead, in your review of the Stephenson patent, from the perspective of one of ordinary skill in the art, at the time of the invention, would—would you agree that the Stephenson patent uses play between and play against a host computer interchangeably? A. Yes, I would agree.").) As used in the '237 patent "between" means "against." Thus, the claims explicitly require play between or against the human player and a host computer opponent. Terms used

37

interchangeably in the specification should be given the same meaning. *Tate Access Floors v. Maxcess Techs.*, 222 F.3d 958, 968 (Fed. Cir. 2000); *Invista N. Am. S.a.r.l. v. M&G USA Corp.*, 951 F. Supp. 2d 604, 624-25 (D. Del. 2013). This is consistent with the '237 patent's specification, which repeatedly describes competition between the player and host computer: "In the qualifying round the player *competes against a host computer*." (A29, Abstract (emphasis added); A491, ¶ 57.)

### 4. The Board's Construction Ignores the Claim Language, the Specification and Applicable Claim Construction Principles.

The Board did not adopt Stephenson's plain-meaning definition of "playing." Instead, the Board erred by construing "playing" to mean "at least administering" and rejecting the definition of "between" as interchangeable with "against." (A353.) The Board stated that its definition of "play" includes "keeping score, operating the game, and monitoring the player's progress"—all activities outside the plain meaning of "playing." (A8.)

The Board adopted GSN's construction, as it did in the Decision on Institution. (A7 ("We are not persuaded that our original interpretation should be modified."); A22.) The Board's original interpretation was flawed in approach as well as in its result. The Board failed to determine the plain meaning of the disputed language. (A350-53.) Instead of determining whether the claims and

specification provided any reason to deviate from the plain meaning of "playing," the Board improperly assessed whether it could possibly reconcile the claims and specification with GSN's special meaning of "playing" to include a word that does not even appear in the patent: "administering." (*Id*.) It relied on extrinsic evidence—expert testimony—without determining whether such evidence should even be considered. The process was legally flawed. By failing to first determine the plain meaning of the disputed claim language, and then determining if the intrinsic record supported that plain meaning, the Board's analysis was fatally flawed and led to the legally-erroneous result of an unreasonably broad construction.

### i.    The Board Erred by Ignoring the Plain Meaning of "Playing."

The first step in claim construction is to ascertain the plain meaning of the phrase at issue. *Vitronics Corp.*, 90 F.3d at 1582. Here, the Board did not take this step at all, let alone at the beginning of its analysis. It did not assert that its construction used the plain meaning of "playing;" its construction in fact did not. There is no dispute that under its ordinary meaning, "playing" does not include administering a game. Players are the ones actually playing a game; administrators sponsor, organize and run a game. Playing and administering are two distinct activities. The Board failed to acknowledge the plain meaning of the claim phrase.

### ii.    The Specification Does not Clearly Require Deviating From the Plain Meaning of "Playing . . . Between"; The Board did not Even Address this Question Either.

The Board erred by failing to assess whether the patentee acted as his own lexicographer or disavowed the plain meaning of "playing . . . between."  Had the Board determined the plain meaning of the language, it would have found the specification did not clearly and explicitly define "play" to mean "at least administer" or disavow the plain meaning.  Instead, it erroneously looked at a different issue: whether a few sentences in the specification could be reconciled with a different, broader construction of "playing a game . . . between" to mean "at least administering."  (A9-10.)

The sentences relied upon by the Board are insufficient to rewrite the plain meaning of "playing" to mean "at least administering."  Those sentences merely disclose different potential functions of the host computer, including both playing a game and sponsoring a game.  (A31, Col. 2:10-21.)  Indeed, claim 1 recites the computer "playing" as well as "evaluating" performance and "distributing" awards—separately describing playing and administering functions.  The cited specification language does not contain a clear and explicit statement necessary to change the meaning of "playing" in the claims to "at least administering."  Moreover, the use of "sponsor" in the cited language, which the Board found is akin to "administering," consistent with the claims, highlights the *difference*

40

between "playing" and "administering."  Finally, the cited language, like the remainder of the specification, is consistent with the language the inventor chose to limit his invention to where the human and host computer both *play* the game.

That specification does not redefine "playing" as encompassing both playing and sponsoring.  Thus, even accepting the Board's conclusion that one of ordinary skill in the art would understand the specification to disclose embodiments where a computer both administers single-player games and also plays the games in multi-player games, that is insufficient to redefine "playing" to mean "at least administering."  *Thorner,* 669 F.3d at 1367-68 (holding that the term "attached" is given its plain meaning despite the specification repeatedly using the term in connection with attachment to an outer surface because such use does not rise to the level of either lexicography or disavowal).  The proper issue, not addressed by the Board, is whether the cited language is consistent with the plain meaning of "playing" or indicates lexicography or disavowal of the plain meaning in favor of a broader meaning.  *See id.*  Here, there is no such inconsistency with or clear disavowal of the plain meaning.

The Board also pointed to disclosure of games in the specification which could be single-player games as supporting its broad construction.  The Board ignored the undisputed evidence that every game disclosed in the specification, including solitaire, has a multi-player version as well.  (A8-9.)  Such a disclosure

of two types of embodiments does not justify redefining the plain meaning of the claim terms to include all possible embodiments. Patent specifications often disclose more than is claimed. *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008) (refusing to construe a term to encompass an alternative embodiment because it contradicted the claim language); *Kruse Tech. P'ship v. Volkswagen AG*, 544 Fed. Appx. 943, 951 (Fed. Cir. 2013) (refusing to redraft an independent claim contrary to its ordinary meaning to avoid excluding a dependent claim). That the specification may disclose both single-player and multi-player games does not support redefining the claims to encompass both types of embodiments, nor modifying the plain meaning of "playing" to mean "administering."

In its Final Written Decision, the Board stated: "As we determined in the Decision on Institution, claim 1 encompasses playing games of skill where a single player plays the game of skill, e.g., 'single-player games' while the computer can 'play' by administering the game, e.g., by keeping score, operating the game, and monitoring the player's progress." (A8.) Here the Board effectively admitted that it provided "play" with a meaning different from its ordinary meaning in order to capture single player versions of solitaire in claim 10.

Contrary to the Board's findings, the specification is *not* consistent with construing "playing" to include other activities. As the Board acknowledged by

citing to *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001),

claim terms must be construed consistently throughout the specification and

claims.  (*See* A9.)  This means that the *same term*, i.e. "playing", cannot have

*different meanings* in the specification.  *Rexnord*, 274 F.3d at 1342.

This doctrine is satisfied here only if "playing" is given its ordinary

meaning, not GSN's or the Board's construction.  Here, throughout the

specification, the same term, "playing," is used to refer to actions of *both* the host

computer *and the human player*.  (A31, Col. 2:2-3 ("Generally, the qualifying

round is played between a single player and a host computer.").)  Human players

"play" the game as does the host computer.  This consistent-meaning requirement

is readily met if "play" is given its plain meaning.

Under the Board's construction, however, the principle that the same term

must have the same meaning is problematic.  A fair reading of the specification,

and common sense, is that the human player is never charged with "at least

administering" the game.  The human players only "play" the game in the ordinary

sense.  Moreover, under GSN's construction adopted by the Board, claim 1 would

be broad enough to cover a qualifying round of a tournament with *no playing*—

where *both* the human player and the host computer "at least administer" a game.

Construing the claims to effectively encompass a tournament where everyone

keeps score, but no one plays, is nonsensical.  Nothing in the claims or the

43

specification discloses such a system. The consistent-meaning doctrine confirms that the Board's construction is unreasonably broad in the context of the claims, the '237 patent's specification, and the prior art of record.

### iii. The Board's Reliance on Dependent Claim 10 to Support its Construction is Misplaced.

The Board also supported its construction by arguing that dependent claim 10 includes games that *can be* played by a single player *or* multiple players, and thus claim 1 *must be* broad enough to cover single-player games. Specifically, the Board cites to solitaire, listed in dependent claim 10, to support its construction of "play between" to mean "at least administer" in independent claim 1. (A8.)

In its decision instituting the IPR, the Board assumed that "[a] person of ordinary skill in the art would have understood solitaire to be a single-player game with no head-to-head competition, or second player involved." (A351.) As the Board acknowledged in its Final Written Decision, that assumption was wrong. (A8.) Both experts agreed that solitaire can be played by two or more players in competition. (A492, ¶ 58-A493, ¶ 59; A557, at 112:9-14.) *See also Scarne's Encyclopedia of Card Games*. (A1376-77 ("any solitaire may be played as a competitive game among two or more persons.").) With this contrary evidence, the Board dropped its erroneous assumption and acknowledged that solitaire may be a multi-player game. (A8.) It nevertheless concluded that its construction was proper because "solitaire" is "traditionally" a single-player game and the

44

specification of the '237 patent did not explicitly describe the two-player version of solitaire.  (A8.)

The Board's logic is flawed.  The specification does not explicitly describe single-player *or* double-player versions of solitaire.  It discloses solitaire—and both experts agreed that at the time of the invention, solitaire included *two-player* versions.  (A492, ¶ 58-A493, ¶ 59; A557, 112:9-14.)  The plain meaning of "playing" should not be disregarded simply because the specification did not specify both types of solitaire.

In its Final Written Decision, the Board reasoned that there is "nothing in the specification of the '237 patent that would have indicated to a person of ordinary skill in the art that Patent Owner intended to exclude traditional single-player versions of games of skill."  (A8.)  However, this was a result-oriented analysis, and answered the wrong question.  The correct question is whether claim 10's reference to solitaire is a *disavowal* of the *plain meaning* of "playing between." The Board did not ask this question, but the answer is clear: it does not.  Because solitaire includes multi-player versions, claim 10 is consistent with reading "playing . . . between" as requiring the host computer to play the game, not merely administer it.  That should end the inquiry.

The Board took a much different approach.  It implicitly assumed that claim 10 had to include all variants (single- and multi-player versions) of every one of

45

the 40 games identified.[1]  At oral argument, Stephenson argued that "the fact that a claim has a specific limitation in Claim 1, you don't broaden it out just because it may not capture every variant that's in a dependent claim," intending to refer to solitaire having both single and multi-player variants.  (A1465, lines 6-8.)  The Board indicated the contrary, responding "Well, I think I do.  I think that's what the court is telling me I have to do, doesn't it?"  (*Id.*, lines 9-10; *see also* A1465 line 1-A1466, line 17.)

The Board's insistence that claim 10 be construed to include every variant of each of the 40 listed games, and claim 1 be construed to encompass every such variant of every such game, is unsupported in the law and erroneous.  An example is helpful here.  Consider an independent claim that includes the limitation "animals that fly" and a dependent claim that indicates that the animals are selected from the group consisting of eagles, hawks, pheasants and squirrels.  The plain meaning of "fly" is not rewritten to mean "at least run" just to ensure the dependent claim captures traditional squirrels.  Rather, proper claim construction dictates that "fly" means "fly," and thus the dependent claim excludes traditional non-flying squirrels, and includes flying squirrels.  *See Thorn Emi N. Am., Inc. v. Intel Corp.*, 928 F. Supp. 449, 464-65 (D. Del. 1996) (rejecting the argument that a potentially broad reading of a dependent claim allows courts to ignore a specific

---

[1] This is also the approach that GSN's expert used in construing the disputed claim language.  (A555, at 105:13-18.)

limitation in an independent claim from which it depends, especially when a logical alternative reading of the dependent claim exists); *see also North Am. Vaccine v. Am. Cyanamid Co.*, 7 F.3d 1571, 1577 (Fed. Cir. 1993) (finding that dependent claims are only an interpretation aid and not conclusive regarding the scope of the independent claim upon which it depends, and rejecting the argument that possible breadth in a dependent claim requires broadening the language of the independent claim); *Multilayer Stretch Cling Film Holdings, Inc. v. Interplast Group, Ltd.*, No. 2:12-cv-2107, 2013 U.S. Dist. LEXIS 160073, at *66 (W. Dist. Tenn. Nov. 8, 2013) (rejecting the argument that a dependent claim can broaden a closed Markush group contained in an independent claim).

Addressing the only relevant question, claim 10 is consistent with Stephenson's position that "playing . . . between" should be given its plain meaning that requires the computer to play the game. Thus, Stephenson's construction of "play between…" in claim 1 is consistent with claim 10's inclusion of solitaire. (A492, ¶ 58-A493, ¶ 59.) Broadening the "play" language of independent claim 1 based on one potential version of "solitaire" listed in claim 10 among 40 other games ignores claim construction principles. It is also inconsistent with how one of ordinary skill in the art would understand the claims in view of the specification.

### iv.   The Board Erred in Disregarding the Interchangeability of "Between" and "Against" as Agreed by Both Sides' Expert.

The Board erred in finding that "between" was not interchangeable with "against" in the '237 patent. The '237 patent specification uses the terms "between" and "against" interchangeably. Both experts agree that the '237 patent uses the terms "between" and "against" interchangeably. (A490-91, ¶ 56; A585, at 224:20-225:4.) The Board erred by rejecting the experts' consensus of how one of skill in the art would understand the use of these terms in the '237 patent and defining "between" inconsistent with "against." This too, supports use of the plain meaning of "play" as it confirms the computer and human are "playing" in a similar way against each other.

### C.   The Board Erred in Holding that Claims 1-19 are Unpatentable Because of the Erroneous Construction of the "Playing . . . Between" Element.

There are only two Grounds for which this IPR was instituted and decided and thus, only two Grounds are at issue in this appeal. They are as follows: (1) whether claims 1-3, 5 and 8-19 are unpatentable under 35 U.S.C. § 102(b) as anticipated by Walker and (2) whether claims 4, 6, and 7 are unpatentable under 35 U.S.C. § 103 over Walker. (A365.) As GSN admits, this case turns on claim construction. (A1435 ("If the Panel resolves the claim construction issues that the parties have disputed, the case is essentially resolved.").) Because the Court

should conclude that "playing a game . . . between" means the host computer must play the game, then the Board should be reversed and the patentability of the claims confirmed.

Stephenson's patent claims an invention that is distinctly different and better than Walker. The claims provide a system that reduces the opportunity to cheat because two humans do not compete in a qualifying round against each other, a player can play at any time because the computer opponent is always ready, and it provides a more reliable gauge of a players skill by removing the variation caused by a human opponent. Walker on the other hand discloses a system where the computer merely administers games between two human players or administers single player games. GSN did not contend that Walker invalidates the claims under Stephenson's plain-meaning construction. Under the proper construction, Walker does not render any of the claims of the '237 patent unpatentable.

### 1. The Board Erred in Finding that Walker Anticipates Claims 1-3, 5, and 8-19.

The Board found that Walker anticipates claims 1-3, 5, and 8-19 based on its construction of "playing a game . . . between" to mean the host computer at least administers the game. (A21-23.) The Board found that Walker discloses administering a game and thus meets the limitation of claim 1 under the Board's unreasonably broad construction: "Host computer 102 participates in the qualifying round by administering the game, such as by keeping a player's score and

determining whether the player qualifies to advance to the next round (e.g., playoff round)." (A22.) The Board relied *exclusively* on Walker's disclosure of *administering* a game to meet the "playing a game…between" limitation. Based on this the Board found claims 1-3, 5, and 8-19 unpatentable. (A23.)

Walker does not disclose a host computer playing a game under Stephenson's proposed construction. GSN has never argued otherwise. Thus, Walker fails to anticipate claims 1-3, 5, and 8-19. The Board's determination should be reversed and the challenged claims should be confirmed.

### 2. The Board Erred in Finding that Walker Renders Claims 4, 6 and 7 Obvious.

The Board found that claims 4, 6, and 7 are obvious in view of Walker similarly based on its unreasonably broad construction of "playing a game . . . between" to mean the host computer at least administers the game. (A23-26.) The Board, again relying on its unreasonably broad "at least administer" construction, assumed that limitation was met by Walker in making its obviousness determination. GSN makes no arguments and the Board made no findings that, under Stephenson's construction, these claims would be unpatentable as obvious in view of Walker. (A26.) Thus, the Board's finding that claims 4, 6 and 7 are unpatentable should be reversed and the claims should be confirmed patentable.

## VII.  CONCLUSION AND STATEMENT OF RELIEF SOUGHT

The Board erred in construing the "playing a game . . . between" limitation to broadly mean the host computer "at least administers the game."  This limitation is in every challenged claim.  Under the proper construction, the computer is required to play the game—not merely administer it.  Walker does not disclose a host computer playing a game and thus does not render the claims at issue anticipated or obvious as properly construed.  Thus, Stephenson respectfully request that this Court reverse the Board's claim construction and find the challenged claims patentable.

Dated:  April 24, 2015

/s/ Daniel W. McDonald
Daniel W. McDonald
Thomas J. Leach
Rachel C. Hughey
Robert A. Kalinsky
MERCHANT & GOULD P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55120
Telephone:  612-332-5300
Facsimile:  612-332-9081

**ADDENDUM**

JOHN H. STEPHENSON
V.
GAME SHOW NETWORK, LLC AND WORLDWINNER.COM

APPEAL NO. 15-1359

| A Begin | A End | Paper No. /Exhibit | Date Filed | Document(s) |
|---------|-------|--------------------|------------|-------------|
| A1 | A28 | 51 | 11/07/14 | Final Written Decision |
| A29 | A35 | Ex. 1001 | 05/17/13 | U.S. Patent No. 6,174,237 |

Trials@uspto.gov                          Paper 51
571-272-7822                              Entered:  November 7, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

GAME SHOW NETWORK, LLC and WORLDWINNER.COM, INC.,
Petitioner,

v.

JOHN H. STEPHENSON,
Patent Owner.
_____

Case IPR2013-00289
Patent 6,174,237
_____

Before SALLY C. MEDLEY, KEVIN F. TURNER, and
BENJAMIN D. M. WOOD, *Administrative Patent Judges.*

MEDLEY, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2013-00289
Patent 6,174,237

## I. BACKGROUND

Game Show Network, LLC and WorldWinner.com, Inc. (collectively "Petitioner") filed a Petition (Paper 1; "Pet.") seeking *inter partes* review of claims 1–19 of U.S. Patent No. 6,174,237 ("the '237 patent") pursuant to 35 U.S.C. §§ 311–319.  On November 19, 2013, we instituted an *inter partes* review of claims 1–19 on two grounds of unpatentability (Paper 8; "Dec. on Inst.").

Subsequent to institution, John H. Stephenson ("Patent Owner") filed a Patent Owner Response (Paper 22; "PO Resp."), and Petitioner filed a Reply (Paper 35; "Pet. Reply").

Patent Owner filed a Motion to Exclude (Paper 41; "Mot. to Exclude") Exhibits 1011, 1012, 1013, 1014, and 1021.  Petitioner filed an Opposition to the Motion to Exclude (Paper 43; "Exclude Opp."), and Patent Owner filed a Reply (Paper 44; "Exclude Reply").

An oral hearing was held on July 10, 2014, and a transcript of the hearing is included in the record (Paper 50; "Tr.").

The Board has jurisdiction under 35 U.S.C. § 6(c).  This final written decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that claims 1–19 of the '237 patent are unpatentable.

IPR2013-00289
Patent 6,174,237

*A. The '237 Patent*

The '237 patent relates to tournament play having a qualifying round and a playoff round. The qualifying round is played between a player, through a computer terminal, and a host computer. The playoff round is played between those players obtaining a predetermined level of performance in the qualifying round and the host computer. The playoff round is played under the same rules and conditions as in the qualifying round, except that all the players are playing simultaneously within a specific time frame. Ex. 1001, 1:15–24.

*B. Illustrative Claim*

Claim 1 of the '237 patent is the only independent claim:

1. A method of playing a game of skill tournament having a qualifying round and a playoff round, and played over an interactive computer system, said interactive computer system having a host computer system, a plurality of terminals, computers and compatible software, said method comprising the following steps:

a. playing a game of skill in a qualifying round between a single player and the host computer;

b. evaluating the results of said qualifying round to determine if said player qualifies to be classified within a specific performance level from a plurality of performance levels ranging from a low performance level to a high performance level;

c. evaluating the results of said qualifying round to determine if said player qualifies to be classified within a qualifying performance level taken from said plurality of performance levels;

IPR2013-00289
Patent 6,174,237

d.  distributing to said player a performance level award, said performance level award being dependent upon the specific performance level obtained;

e.  playing said game of skill in a playoff round between said player and the host computer simultaneously along with other players, wherein each player has been classified within a qualifying performance level;

f.  evaluating the results of said playoff round to determine a tournament winner and subsequent ranking of players; and

g.  distributing tournament awards to tournament participants.

*C. Prior Art*

The pending grounds of unpatentability in this *inter partes* review are based on the following prior art:

PCT International Publication No. WO 97/39811, published Oct. 30, 1997 ("Walker") (Ex. 1002).

*D. Pending Grounds of Unpatentability*

This *inter partes* review involves the following grounds of unpatentability:

| References | Basis | Claims |
|---|---|---|
| Walker | 35 U.S.C. § 102(b) | 1–3, 5, and 8–19 |
| Walker | 35 U.S.C. § 103 | 4, 6, and 7 |

## II. ANALYSIS

### A. *Level of Skill of Person in the Art*

In support of its Petition, Petitioner relies on the testimony of its expert, Dr. E. James Whitehead, Jr. (*e.g.*, Ex. 1005).  In support of its Response, Patent Owner relies on the testimony of its expert, Stacy A. Friedman (*e.g.*, Ex. 2007).  Both Dr. Whitehead and Mr. Friedman testify as to the level of skill a person in the art would have had at the time of the invention.  *See, e.g.*, Ex. 1005 ¶ 25; Ex. 2007 ¶ 45.  Mr. Friedman testified, however, that he disagreed with Dr. Whitehead's assessment that a person in the art would have had an undergraduate degree and significant first-hand experience observing, administering, and/or participating in competitive tournaments.  Ex. 2007 ¶¶ 46–47. According to Mr. Friedman, a person of ordinary skill in the art at the time of the invention would have had either (1) a degree in computer science and one year of experience designing computer gaming, or (2) no formal degree and three to four years of experience designing computer gaming applications.

It is not necessary for us to resolve the apparent dispute to reach a determination on the merits, and both parties agree that we need not resolve, between Mr. Friedman and Dr. Whitehead, who is correct. Tr. 7–8, 25–27.  For purposes of this decision, we find that the level of ordinary skill in the art is reflected by the prior art of record.  *Okajima v. Bourdeau*, 261 F.3d. 1350, 1355 (Fed. Cir. 2001) (the prior art itself can reflect the appropriate level of skill in the art.)

IPR2013-00289
Patent 6,174,237

### *B. Claim Interpretation*

Consistent with the statute and legislative history of the Leahy–Smith America Invents Act, Pub. L. No. 112–29, 125 Stat. 284 (2011) ("AIA"), the Board interprets claims using the "broadest reasonable construction in light of the specification of the patent in which [they] appear[]." 37 C.F.R. § 42.100(b); *see also* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012). There is a "heavy presumption" that a claim term carries its ordinary and customary meaning. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). Also, we must be careful not to read a particular embodiment appearing in the written description into the claim if the claim language is broader than the embodiment. *See In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993) ("limitations are not to be read into the claims from the specification").

### *1. "Playing a game of skill in a qualifying round between a single player and the host computer"*

In the Decision on Institution, based on the arguments presented by Petitioner in the Petition and by Patent Owner in its Preliminary Response, we interpreted the above quoted claim 1 term to mean playing a game of skill in a qualifying round, where the game includes only one human player and is at least administered by a host computer. Dec. on Inst. 6–9. Petitioner agrees with this interpretation. Pet. 13; Pet. Reply 7. Patent Owner argues that the interpretation is incorrect, and that "playing a game of skill in a qualifying round between a single player and the host computer" means "playing a game of skill in a qualifying round where a single human player plays against a host computer opponent;" or stated another way, the

IPR2013-00289
Patent 6,174,237

phrase requires both the single player and host computer to play the game in competition with each other.  PO Resp. 23.[1]  The interpretation proposed by Patent Owner would exclude single-player games of skill[2] while the original interpretation would include single-player games of skill.  We are not persuaded that our original interpretation should be modified.

We begin with the language of claim 1, the sole independent claim. The preamble of claim 1 recites a method of playing a game of skill tournament having a qualifying round and a playoff round, and played over an interactive computer system.  The first step of the method recites "playing a game of skill in a qualifying round between a single player and the host computer."  Thus, claim 1 requires playing a game of skill *between* a single player and the host computer.

Both parties agree that "between" means "by the common action of: jointly engaging."  PO Resp. 24 (citing Ex. 2001, 109); Pet. Reply 10. Patent Owner argues that the word "between" means that both the human player and host computer are playing the game as opponents or in competition.  PO Resp. 24.  As Petitioner points out, however, the definition of "between" includes cooperation—not just competition—between two parties.  Pet. Reply 10; Ex. 1020, 91:2–13.  The word between, in the context of claim 1, does not mean necessarily that the host computer is in competition with the single player.  Nor are we persuaded by Patent Owner's

---

[1] The parties also refer to this concept (e.g., playing the game in competition with each other) as "head-to-head competition."  *See, e.g.*, Pet. 12; PO Resp. 17; Pet. Reply 10–11.
[2] Single-player games of skill refers to those games where only one person is in competition (no opponent), such as traditional solitaire, trivia, crossword puzzles, etc.  *See, e.g.*, Pet. 12; PO Resp. 24–25; Pet. Reply 8.

IPR2013-00289
Patent 6,174,237

argument that "playing" a game requires the computer to play the game as a computer opponent. PO Resp. 24, 27; Ex. 2007 ¶¶ 58–59. Claim 1 does not require the computer to play the game as an opponent or for the single player and the host computer to compete against each other. As we determined in the Decision on Institution, claim 1 encompasses playing games of skill where a single player plays the game of skill, e.g., "single-player games" while the computer can "play" by administering the game, e.g., by keeping score, operating the game, and monitoring the player's progress. Dec. on Inst. 7.

Dependent claim 10, which indirectly depends from claim 1, specifies that the game of skill is a card game that includes solitaire. Ex. 1001, 6:64. In the Decision on Institution, we determined that playing solitaire does not require head-to-head competition. Dec. on Inst. 7. Patent Owner argues, and Petitioner does not disagree, that solitaire can be played by two players—"double solitaire." PO Resp. 24; Pet. Reply 10; Ex. 2004; Ex. 2005. It is not disputed, however, that "solitaire" is traditionally a single-player game, and that the Specification of the '237 patent does not describe a two-player version of solitaire. Ex. 2007 ¶ 59; Ex. 1020, 102:8–9, 109:23–110:11. We are not persuaded by Patent Owner's argument that claim 10 is limited to a two-player version of solitaire, but excludes the traditional single-player version of solitaire. PO Resp. 24. There is nothing in the Specification of the '237 patent that would have indicated to a person of ordinary skill in the art that Patent Owner intended to exclude traditional single-player versions of games of skill. Moreover, Patent Owner's argument is based on the premise that we should construe narrowly claim 1 to exclude single player games, and then to make all other dependent claims

fit that narrow construction.  Patent Owner's position is contrary to the legal requirements of claim construction.  Rather, we look to the use of terms in other claims, such as dependent claims, to ascertain the meaning of terms in broader independent claims.  *See* 35 U.S.C. 112, ¶ 4; *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001); Tr. 35 ("Mr. Leach: . . . And the fact that a claim has a specific limitation in claim 1, you don't broaden it out just because it may not capture every variant that's in a dependent claim.  Judge Turner:  Well, I think I do.  I think that's what the court is telling me I have to do, doesn't it?").

We next look to the specification to determine if our construction is consistent with the specification.  Patent Owner argues that the Specification uses the terms "between" and "against" interchangeably, and that the Specification describes embodiments where the computer is competing against a single player.  PO Resp. 24 (citing Ex. 2002, Abstract).  Even so, we disagree, that "against" should be read into the claim in place of "between" as Patent Owner urges us to do.  Claim 1 recites "between" not "against" and Patent Owner has not shown that it defined the term "between" in the Specification of the '237 patent with reasonable clarity, deliberateness, and precision to mean "against."  *See In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

At issue in this case, is the meaning of the following portion of the Specification of the '237 patent:

> The qualifying round is played between a single player through a computer terminal and a host computer.  The host computer has the ability to act as a game sponsor by keeping score, operating the game, monitoring the player's progress and to distribute awards when appropriate.  Also, the host computer

9

IPR2013-00289
Patent 6,174,237

> has the ability to act as another player if the game requires more
> than a single player.

PO Resp. 27–28 (citing Ex. 1001, col. 2, ll. 7–15).

Petitioner argues that the above paragraph is consistent with the "at least administered by the host computer" construction, because the second and third sentences describe an embodiment where the host computer acts as a sponsor by administrating the game, but does not act necessarily as an opponent for single player games.  Pet. 12; Pet. Reply 7–8.  Patent Owner argues that the above paragraph is consistent with its construction that the host computer acts as an opponent, because the paragraph describes that the computer acts as an opponent at all times.  PO Resp. 27–29.  In other words, Patent Owner interprets the first sentence to mean that the host computer plays as an opponent, the second sentence to mean that the host computer additionally can act as a game sponsor, and the third sentence to mean that the computer additionally can act as yet another opponent (e.g., as a team against the single player) if the game requires more than a single computer player.  PO Resp. 28–29; Ex. 2007 ¶¶ 62–66.

We have reviewed the expert testimony from both sides with respect to how a person of ordinary skill in the art would interpret the above paragraph.  *See, e.g.*, Ex. 1005 ¶ 35; Ex. 2007 ¶¶ 62–66; We give more weight to Dr. Whitehead's testimony[3] than we do to Mr. Friedman's testimony, because we find that Dr. Whitehead's testimony is consistent with the words from the above recited paragraph of the Specification, while

---

[3] Patent Owner argues that the Board should give Dr. Whitehead's testimony little weight.  PO Resp. 9–10.  We are not persuaded by the arguments, because the evidence to which we are directed does not support the conclusion that Dr. Whitehead's declaration was "spoon-fed" to him as asserted.  *Id.*

IPR2013-00289
Patent 6,174,237

Mr. Friedman's testimony is not. The first sentence is a general description and the second and third sentences explain the role of the host computer in the context of the first sentence. Importantly, the third sentence explains that "if the game requires more than a single player" the host computer has the ability to act as another player beyond the "single [human] player." We disagree with Patent Owner that reference to "single player" in the third sentence means "single [computer] player" as Patent Owner asserts. PO Resp. 28–29. We agree with Petitioner and its expert that a person of ordinary skill in the art would have read the paragraph to mean that the game that may be played by the system can be a single player game, where the computer merely sponsors the game but does not play as an opponent. Moreover, there are several examples of games listed in the Specification that even Patent Owner's expert Mr. Friedman recognizes are traditionally single player games, such as solitaire, word search, crossword puzzles, and trivia games. Ex. 1001, 3:43–52; Ex. 2007 ¶ 59; Ex. 1020, 102:8–9, 109:23–110:11. The description of these traditional single player games further supports the reading of the above paragraph to include single player games where the host computer would not play the game in competition, but would merely administer the game. The Specification is, therefore, consistent with our previous interpretation. Dec. on Inst. 6–9.

Applying the broadest reasonable interpretation of the claims in light of the Specification of the '237 patent, "playing a game of skill in a qualifying round between a single player and the host computer" means playing a game of skill in a qualifying round, where the game includes only one human player and is at least administered by a host computer.

IPR2013-00289
Patent 6,174,237

>   *2. "Playing said game of skill in a playoff round between*
> *said player and the host computer simultaneously along with other players"*

In the Decision on Institution, based on the arguments presented by Petitioner in the Petition and by Patent Owner in its Preliminary Response, we interpreted the above quoted claim 1 term to mean "playing the game of skill in a playoff round at least administered by the host computer and in which the human player involved in the qualifying round and at least two other human players are playing at the same time." Dec. on Inst. 9–10. Petitioner agrees with this interpretation. Pet. 15. Patent Owner argues that the interpretation is incorrect, because the phrase does not require at least two other human players are playing (in addition to the "said player") at the same time. PO Resp. 30. Patent Owner argues that "other players" means "at least one other player." In addition, Patent Owner argues that the claim requirement "simultaneously" should be construed to mean that there is some overlap in play.[4] *Id.*

Patent Owner is arguing for a broader interpretation than the one in the Decision on Institution. Instead of our construction of "at least two other human players," Patent Owner's proposed broader construction includes "at least one other human player." We need not resolve this issue for purposes of this decision. Patent Owner's broader construction encompasses our narrower construction and would include at least two other human players.

---

[4] The disputed term includes language that is similar to step (a) regarding the playing between a player and computer. Patent Owner, however, does not present arguments regarding playing a game between a player and the host computer in the context of the disputed limitation. To the extent that Patent Owner does make such arguments, the analysis for both steps (a) and (e) regarding playing a game of skill between a player and host computer would be the same.

IPR2013-00289
Patent 6,174,237

Moreover, we need not resolve the issue of whether "simultaneously" means that there is some overlap in play, because our construction of simultaneously to mean at the same time would include some overlap in play and even Patent Owner recognizes that the distinction is minor. PO Resp. 31.

Applying the broadest reasonable interpretation of the claims in light of the Specification of the '237 patent, "playing said game of skill in a playoff round between said player and the host computer simultaneously along with other players" means playing the game of skill in a playoff round at least administered by the host computer and in which the human player involved in the qualifying round and at least two other human players are playing at the same time.

### 3. "Evaluating the results of said qualifying round"

Claim 1 recites "evaluating the results of said qualifying round" in steps (b) and (c). Patent Owner argues that the "evaluating the results" steps mean that a single human player is evaluated based solely on the single human player's performance (against the computer) and not based on comparing that performance against any other player who played a game of skill. PO Resp. 33–34. Petitioner disagrees with Patent Owner's proposed construction and argues that there is no requirement in the claims that the "evaluating the results" steps are based on a single player's performance (e.g., "absolute criteria"). Pet. Reply 2–3. Petitioner argues that the claim does not preclude evaluating the results of the qualifying round based on evaluating multiple performances of multiple players that participated in a qualifying round. Petitioner concludes that the evaluating limitations cover

IPR2013-00289
Patent 6,174,237

either an absolute evaluation of a single player's performance or a relative evaluation of multiple players' performances.  *Id.* at 4.

We did not construe the meaning of the term "evaluating the results of said qualifying round" in connection with the Decision on Institution.  We do so here, because it is an issue that is germane to our patentability determination.

We begin with the plain language of the claim.  First, we agree with Petitioner that there is nothing in the language itself that explains how the evaluating is performed.  That is, there is nothing in claim 1 itself that suggests that the evaluating must be done based on the single player's performance of the game of skill in isolation of any other factors or criteria.  Thus, we are not persuaded by Patent Owner's argument that the disputed language means evaluating a single player "into predetermined, absolute performance levels independent of their performance relative to others in the qualifying round."  PO Resp. 36.  The claim is based on evaluating the results of the *qualifying round*, not the results of the one single game that the one single human player played.  There is nothing in the claim language that specifies that the *qualifying round* is based on a single game played by a single human player despite Patent Owner's argument to the contrary.  *See Id.* at 33.  While the "game of skill" recited in step (a) refers to a game played by a single player, the qualifying round is not so limiting.  The qualifying round may include other single players playing their own games of skill between themselves and the host computer.  Claim 1 does not put limits on what constitutes the qualifying round or the evaluating of a qualifying round.  Indeed, step (e) of claim 1 recites the playoff round to be "between said player . . . and other players" that qualified from the

IPR2013-00289
Patent 6,174,237

qualifying round, which could include the participation of multiple human players in the qualifying round.  As Petitioner points out, too, Patent Owner's expert admitted that the qualifying round could include multiple players.  Pet. Reply 4; Ex. 1020, 58:8–60:16.  Based on the plain language of claim 1, the evaluating steps evaluate the qualifying round, which could include more than one game and more than one player.  Accordingly, the evaluating steps may be based (1) on the multiple performances of the multiple players that participated in the qualifying round or (2) on the absolute evaluation of a single player's performance.  Claim 1 is broad and covers both scenarios.

We have considered the examples in the specification to which Patent Owner directs our attention regarding evaluating a single player's performance based on whether the player has scored a sufficient number of points to qualify for the qualifying round—an absolute criterion.  However, those are examples and there is nothing in the Specification which suggests that we should limit our reading of claim 1 to include them.  Claim 1 is silent with respect to how a player's performance is evaluated, and, based on the record before us, we decline to read limitations from the specification into the claims.

Applying the broadest reasonable interpretation of the claims in light of the Specification of the '237 patent, the steps of "evaluating the results of said qualifying round" may be based (1) on the multiple performances of the multiple players that participated in the qualifying round or (2) on the absolute evaluation of a single player's performance.

4.  *"Performance level award increases as a player qualifies for higher performance level classifications"*

Claim 4 depends directly from claim 1 and recites "wherein said performance level award increases as a player qualifies for higher performance level classifications."  The "said performance level award" is in reference to the performance level award of claim 1 step (d) which is dependent upon the performance level obtained in connection with a qualifying round.  Patent Owner argues that the limitation "as a player qualifies" requires that the higher performance level classification be determinable while the player is playing, not after the qualifying round is complete.  PO Resp. 39.  Stated another way, Patent Owner argues that the player must be able to know that they have qualified for a higher performance level award as they are playing, not afterwards.  *Id.*  Petitioner disagrees and argues that claim 4 says nothing about when the player knows that he or she has qualified for a higher performance level.  Pet. Reply 14.

We did not construe the meaning of the term "wherein said performance level award increases as a player qualifies for higher performance level classifications" in connection with the Decision on Institution.  We do so here, because it is an issue that is germane to our patentability determination.

There is no requirement, in the claims themselves, that specifies when the performance level classification is determined—it could be during, or after the player has played the qualifying round.  We disagree with Patent Owner that the plain language of "as a player qualifies" means that the determination is performed while the player is playing the game of skill.  The term "as a player qualifies" does not mean "as a player plays the game."

16

The Specification of the '237 patent supports the construction that the performance level classification may be determined after the player has played the qualifying round because it describes that "after each player has completed the qualifying round, the results are analyzed." Ex. 1001, 5:23–24.

Applying the broadest reasonable interpretation of claim 4 in light of the Specification of the '237 patent, "wherein said performance level award increases as a player qualifies for higher performance level classifications" includes determining the higher performance level classification, and thus the award, after a player plays the game.

### 5. "Said game of skill is based on the memory reaction of the player"

Claim 15 depends directly from claim 1 and recites "wherein said game of skill is based on the memory reaction of the player." In the Decision on Institution, based on the arguments presented by Petitioner in the Petition and by Patent Owner in its Preliminary Response, we interpreted the above quoted claim 15 term to mean that the game of skill involves assessing both a player's memory and how quickly the player reacts. Dec. on Inst. 12. Patent Owner disagrees that "memory reaction" involves the assessment of two things—memory and reaction, but involves the assessment of "reaction involving memory." PO Resp. 32–33. We see no distinction between the two constructions, and in any event, the construction of claim 15 does not matter to our determination of the patentability of that claim. Accordingly, we adopt our previous construction. Dec. on Inst. 12.

Neither party contests the Decision on Institution construction for the claim 1 phrase "game of skill," "evaluating the results of said playoff round

IPR2013-00289
Patent 6,174,237

to determine a tournament winner and subsequent ranking of players" or the order of steps (b) and (c) construction of claim 1, and we discern no reason on the record before us to change the construction of these terms.  Dec. on Inst. 5–6, 10–12.  Accordingly, we adopt those constructions here.

### C. Claims 1–3, 5, and 8–19 are Anticipated by Walker

With respect to the alleged anticipation of claims 1–3, 5, and 8–19 over Walker, we have reviewed the Petition, Patent Owner Response, and Petitioner Reply, as well as the evidence discussed in each of those papers. We are persuaded, by a preponderance of the evidence, that claims 1–3, 5, and 8–19 are unpatentable under 35 U.S.C. § 102(b) as anticipated by Walker.

### 1. Walker

Walker describes a method and system for a distributed electronic tournament system in which remotely located players participate in a tournament through input/output devices connected to a central controller that manages the tournament.  Ex. 1002, Abstract.

Figure 1 of Walker, reproduced below, illustrates a portion of the electronic tournament system.



FIG. 1

Figure 1 depicts a distributed electronic tournament system.

Figure 1 of Walker shows a plurality of input/output (I/O) devices 104, 106 (plurality of terminals) connected to central controller 102 (host computer) through network 108, such as the Internet. *Id.* at 9. Operating system software runs the central controller hardware and controls and coordinates all tournament software applications, including running tournament games, registering players, accepting entry fees, and coordinating prize payment. *Id.*

Players may participate in various strategy games (games of skill), such as chess, checkers, bridge, or puzzles like crossword or jigsaw. *Id.* at 15, 16:4–5. Walker describes a "qualifying round" of play in which a player may qualify to advance to the next level. *Id.* at 14:6–15. Host computer 102 participates in the qualifying round by administering the game, such as by keeping a player's score and determining whether the player qualifies to

advance to the next round (e.g., playoff round). *Id.* at 15:15–20. Walker describes single-player games, such as trivia and crossword puzzles. *Id.* at 3:3–10, 15:11, 17–18. For the example of trivia play, Walker describes a single human player having completed twenty questions of the first round (qualifying round), and that the host computer then would determine, based on the player's performance, whether the player had qualified to advance to the next round. *Id.* at 15:15–20.

Walker also describes that the tournament system evaluates the results of play, and as the tournament progresses, more and more players are eliminated. Moreover, when a player advances from one game session to the next, the player may qualify for a prize or recognition. *Id.* at 15:29–16:2. Lastly, a tournament winner is determined after a final round of an elimination tournament and prizes are awarded. *Id.* at 15:20–21.

## 2. Claim 1

Petitioner relies on Walker as teaching the method of playing a game of skill tournament limitations of claim 1. Pet. 19–29. Patent Owner argues that Walker does not anticipate claim 1 because Walker does not describe 1) the steps (b) and (c) of "evaluating the results of said qualifying round" and 2) playing a game of skill in a qualifying round between a single player and the host computer.

### a. Evaluating the results of said qualifying round

Patent Owner argues that Walker does not describe that the evaluating of results of the qualifying round is determined based on a single player's performance. PO Resp. 35. Patent Owner argues that Walker instead

IPR2013-00289
Patent 6,174,237

describes that the evaluating is determined based on the player's performance as well as the performance of other players in the qualifying round, directing attention to the following description in Walker:

> Another preferred embodiment includes the step of determining whether a player has qualified for advancement to the next game session. This includes the step of the central controller reviewing the player's score *after the just-concluded game session.* This score is *compared to the scores obtained by all of the other players* in the session.

PO Resp. 35 (citing Ex. 1002, 14 (emphasis added by Patent Owner)).

Patent Owner's argument is based on its proposed construction of claim 1. As discussed above in the claim construction section, we disagree with Patent Owner that the broadest reasonable interpretation of the evaluating steps is based on any particular criteria. No criteria are claimed. Rather, the "evaluating the results of said qualifying round" steps are broad and may be based (1) on the multiple performances of the multiple players that participated in the qualifying round or (2) on the absolute evaluation of a single player's performance.

As Patent Owner has highlighted with respect to the above passage from Walker, Walker describes evaluating the results based on the multiple performances of the multiple players that participated in the qualifying round, and, therefore, Walker describes the disputed limitation.

### b. *"Playing a game of skill in a qualifying round between a single player and the host computer"*

Patent Owner argues that Walker does not describe a host computer acting as an opponent playing a human player in either a qualifying round or

21

IPR2013-00289
Patent 6,174,237

playoff round.  PO Resp. 37.  Patent Owner's arguments are based on a
narrow claim interpretation that we have not adopted.

As discussed above in the claim construction section, we disagree
with Patent Owner that the broadest reasonable interpretation of the "playing
a game of skill . . . between a single player and the host computer" means
that the host computer competes against the single player.  Applying the
broadest reasonable interpretation of the claims in light of the Specification
of the '237 patent, "playing a game of skill in a qualifying round between a
single player and the host computer" means playing a game of skill in a
qualifying round, where the game includes only one human player and is at
least administered by a host computer.

Petitioner has shown, by a preponderance of the evidence, that Walker
describes the disputed limitation.  Pet. 20–21.  For example, Walker
describes a "qualifying round" of play in which a player may qualify to
advance to the next level.  Ex. 1002, 14:6–15.  Host computer 102
participates in the qualifying round by administering the game, such as by
keeping a player's score and determining whether the player qualifies to
advance to the next round (e.g., playoff round).  *Id.* at 15:15–20.

Patent Owner argues that absent from the Petition is a description of
what is performing the claimed method, and that such absence highlights the
requirement of the claims that the computer system plays the game as
required by every claim.  PO Resp. 37–38.  The argument is not persuasive
because it is not commensurate in scope with what is claimed.  None of the
claims recite that "the computer system plays the game."  Moreover, Patent
Owner has not shown specifically what is missing from the Petition, or that
the Petition does not address how the Walker reference anticipates claim 1,

IPR2013-00289
Patent 6,174,237

for example.  Claim 1 is a method claim and recites various steps.  The method steps do not recite which of the components of the "interactive computer system" are performing the steps.  Rather, the method steps primarily are functional in nature.  The Petition focuses on this functional language of the claims in its Petition.  *See, e.g.*, Pet. 19–29.

Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that the claim 1 is unpatentable.

### 3. Dependent Claims 2, 3, 5, and 8–19

Patent Owner makes no arguments regarding the additional limitations recited in dependent claims 2, 3, 5, and 8–19.  PO Resp. 33–38.  Upon review of Petitioner's evidence and analysis, we are persuaded that Petitioner has demonstrated that Walker discloses the limitations of dependent claims 2, 3, 5, and 8–19.  Pet. 30–40.  Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that the dependent claims 2, 3, 5, and 8–19 are unpatentable.

### D. Claims 4, 6, and 7 are Obvious in View of Walker

With respect to the alleged obviousness of claims 4, 6, and 7 over Walker, we have reviewed the Petition, Patent Owner Response, and Petitioner Reply, as well as the evidence discussed in each of those papers.  We are persuaded, by a preponderance of the evidence, that claims 4, 6, and 7 are unpatentable under 35 U.S.C. § 103 as obvious in view of Walker.

### 1. Dependent Claim 4

Claim 4 depends directly from claim 1 and recites "wherein said performance level award increases as a player qualifies for higher performance level classifications." The "said performance level award" refers to the performance level award of claim 1 step (d), which in turn refers to the performance level obtained in a qualifying round. In other words, claim 1 step (d) requires, "distributing to said player a performance level award, said performance level award being dependent upon the specific performance level obtained" in a qualifying round. Thus, the performance level award recited in claim 4 is dependent on the performance level obtained from the qualifying round.

Walker describes that a player may be awarded a prize after a qualifying round. Ex. 1002, 16:1–2. Walker further teaches that an award a player may receive at the end of a tournament (after the playoff round) increases as a player qualifies for higher performance level classifications. *Id.* at 13:29–30. The difference, however, between claim 4 and Walker is that Walker does not describe that an award a player may receive after a qualifying round "increases as a player qualifies for higher performance level classifications." Petitioner argues that it would have been obvious to provide multiple levels of awards after a qualifying round because doing so would promote competition by providing an incentive to perform at the highest possible level during the qualifying round. Pet. 48; Ex. 1005 ¶ 78.

Patent Owner argues that Walker does not describe using a pre-established absolute list of performance levels for determining advancement to a subsequent playoff round. PO Resp. 40. The argument is based on Patent Owner's proposed construction of the terms of claim 4. In particular,

IPR2013-00289
Patent 6,174,237

Patent Owner argues that claim 4 requires that the higher performance level classification be determinable while the player is playing, not after the qualifying round, which would result in using a pre-established list of performance levels for determining advancement to a subsequent playoff round. *Id.* at 39.

Patent Owner's arguments are based on a narrow interpretation of claim 4. As discussed above in the claim construction section, we disagree with Patent Owner that the plain language of "as a player qualifies" means that the determination is performed while the player is playing the game of skill. The term "as a player qualifies" does not mean "as a player plays the game." As discussed above, "wherein said performance level award increases as a player qualifies for higher performance level classifications" includes determining the higher performance level classification, and thus the award, after a player plays the game. Moreover, as discussed above in the claim interpretation section, there is nothing in claim 1 that limits how the evaluating is performed and claim 1 could include evaluating each player that played in a qualifying round based on each other's performances (e.g., relative) and not necessarily based on an absolute evaluation as Patent Owner argues.

Patent Owner's arguments are based on a narrow claim construction. We decline to adopt such a construction for the reasons provided above. Patent Owner makes no other arguments regarding the propriety of Petitioner's obviousness showing with respect to claim 4.

IPR2013-00289
Patent 6,174,237

### 2. Dependent Claims 6 and 7

Although Patent Owner categorizes claims 6 and 7 separately, the arguments are directed to claim 1. PO Resp. 40–42. We have addressed those arguments.

### E. Patent Owner's Motion to Exclude

Patent Owner moves to exclude Exhibits 1011, 1012, 1013, 1014, and 1021. Mot. to Exclude 1. In its Reply, Petitioner relies on the exhibits to show alleged inconsistent positions taken by Patent Owner in connection with the meaning of "playing a game of skill between a single player and a host computer" in an earlier district court proceeding involving Patent Owner and a third party. Pet. Reply 13. We did not and need not consider such arguments or evidence in connection with the Reply. We have determined that Petitioner has demonstrated, by a preponderance of the evidence, that all of the claims 1–19 are unpatentable, without considering Petitioner's arguments regarding the alleged inconsistent positions taken by Patent Owner in the earlier district court proceeding.[5] Accordingly, we *dismiss* Patent Owner's Motion to Exclude.

### III. CONCLUSION

We conclude that Petitioner has demonstrated by a preponderance of the evidence that claims 1–3, 5, and 8–19 are anticipated under 35 U.S.C.

---

[5] During oral hearing, counsel for Petitioner represented that it was his expectation that the Board would not, nor need not, rely on the Exhibits 1011, 1012, 1013, 1014, and 1021 to render a final decision. Tr. 15:3–7, 18:16–20.

IPR2013-00289
Patent 6,174,237

§ 102 by Walker, and that claims 4, 6, and 7 would have been obvious under 35 U.S.C. § 103 over Walker.

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–19 of the '237 patent have been shown by a preponderance of the evidence to be unpatentable; and

FURTHER ORDERED that Patent Owner's Motion to Exclude is *dismissed*.

This is a final decision.  Parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2013-00289
Patent 6,174,237

For PETITIONER:

Brenton R. Babcock
Ted M. Cannon
KNOBBE MARTENS OLSON & BEAR, LLP
2BRB@knobbe.com
2tmc@knobbe.com

For PATENT OWNER:

Daniel W. McDonald
Thomas Leach
Robert A Kalinsky
MERCHANT & GOULD, P.C.
dmcdonald@merchantgould.com
stephensonIPR@merchantgould.com
tleach@merchantgould.com
rkalinsky@merchantgould.com



US006174237B1

(12) **United States Patent**

Stephenson

(10) **Patent No.:** **US 6,174,237 B1**

(45) **Date of Patent:** **Jan. 16, 2001**

(54) **METHOD FOR A GAME OF SKILL TOURNAMENT**

(76) Inventor: **John H. Stephenson**, 4608 S. Knoxville, Tulsa, OK (US) 74135

( * ) Notice: Under 35 U.S.C. 154(b), the term of this patent shall be extended for 0 days.

(21) Appl. No.: **09/316,840**

(22) Filed: **May 21, 1999**

(51) Int. Cl.[7] .............................. **A63F 13/00**; A63F 9/24; G06F 17/00; G06F 19/00

(52) U.S. Cl. ................................ **463/42**; 463/25; 463/40; 434/322; 434/332; 700/90; 700/91; 700/92

(58) Field of Search .................................. 463/42, 40, 43, 463/9, 10, 11, 12, 14, 25, 29, 30; 434/322, 323, 324, 332, 350; 700/90, 91, 92, 93

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,593,904 | * | 6/1986 | Graves ............................. 273/1 E X |
| 4,666,160 | * | 5/1987 | Hamilton ............................. 273/242 |
| 4,669,730 | * | 6/1987 | Small ....................... 273/138 A X |
| 4,926,327 | * | 5/1990 | Sidley ......................... 364/412 X |
| 5,038,022 | * | 8/1991 | Lucero ........................ 235/380 X |
| 5,083,271 | * | 1/1992 | Thacher et al. ................ 364/411 X |
| 5,114,155 | * | 5/1992 | Tillery et al. ................. 273/371 X |
| 5,429,361 | * | 7/1995 | Raven et al. ................. 273/138 A |
| 5,454,570 | | 10/1995 | Karal ............................ 273/292 |
| 5,513,117 | * | 4/1996 | Small ......................... 364/479 X |
| 5,518,249 | | 5/1996 | Sines et al. ..................... 273/304 |
| 5,544,892 | * | 8/1996 | Breeding ..................... 273/292 X |
| 5,546,523 | * | 8/1996 | Gatto ......................... 395/156 X |
| 5,549,300 | | 8/1996 | Sardarian ....................... 273/292 |
| 5,566,946 | | 10/1996 | Parker ........................... 273/292 |
| 5,593,349 | * | 1/1997 | Miguel et al. ................. 463/30 X |

| | | | |
|---|---|---|---|
| 5,643,088 | * | 7/1997 | Vaughn et al. ................ 463/40 X |
| 5,649,705 | | 7/1997 | String ............................ 273/292 |
| 5,660,391 | | 8/1997 | Klasee ........................... 273/292 |
| 5,660,392 | | 8/1997 | Hansen ......................... 273/292 |
| 5,743,532 | | 4/1998 | Lafferty ........................ 273/292 |
| 5,755,621 | | 5/1998 | Marks et al. ..................... 463/42 |
| 5,768,382 | * | 6/1998 | Schneier et al. ............ 380/23 X |
| 5,816,918 | * | 10/1998 | Kelly et al. ...................... 463/16 |
| 5,836,586 | | 11/1998 | Marks et al. ..................... 273/292 |
| 5,902,983 | * | 5/1999 | Crevelt et al. .............. 235/380 X |
| 5,944,316 | * | 8/1999 | Hernandez ..................... 273/292 |
| 5,970,143 | * | 10/1999 | Schneier et al. ............ 380/23 X |
| 6,019,374 | * | 2/2000 | Breeding ..................... 273/292 X |
| 6,048,271 | * | 4/2000 | Barcelou ...................... 463/48 X |

* cited by examiner

*Primary Examiner*—Michael O'Neill
*Assistant Examiner*—Binh-An Nguyen
(74) *Attorney, Agent, or Firm*—Head, Johnson & Kachigian

(57) **ABSTRACT**

A method for a game of skill tournament that is challenging and provides the player a reliable gauge of his skill level as compared to other players. The tournament has a qualifying round and a playoff round, and is played over an interactive computer system. In the qualifying round, a player competes against a host computer. The object of this round is to score a sufficient number of points to qualify for the highest level of performance possible. Once a player obtains a level of performance, he is recognized for his accomplishment and given a reward. This allows the player to gauge his skill level. In the playoff round, those players reaching a predetermined level of performance, play the same game simultaneously against the host computer under the same rules and conditions for a set amount of time. At the end of this time frame, the results are analyzed. Those players with the highest point totals will be recognized and given a reward.

**19 Claims, 1 Drawing Sheet**



**Game Show Network Ex. 1001**
IPR of U.S. Pat. 6,174,237



FIG. 1

US 6,174,237 B1

1

# METHOD FOR A GAME OF SKILL TOURNAMENT

## REFERENCE TO PENDING APPLICATIONS

This application is not related to any pending applications.

## REFERENCE TO MICROFICHE APPENDIX

This application is not referenced in any microfiche appendix.

## BACKGROUND OF THE INVENTION

The present invention is directed to a game of skill tournament. Specifically, the present invention is directed to a tournament having a qualifying round and a playoff round, and played on an interactive computer system. The qualifying round is played between a player through a computer terminal and a host computer. The playoff round is played between those players which have obtained a predetermined level of performance and the host computer. This round is played under the same rules and conditions as in the qualifying round except all the players are playing simultaneously within a specific time frame on a specific date.

Interactive video computer software, the Internet and the public's fascination with the challenge, competitiveness and gratification of computer based video games has increased the need for new games and gaming formats. There exists the need for a gaming format which allows a player to gauge the level of skill he possess as compared to other players, without traveling long distances and incurring the expenses of meeting at a central contest site.

For many years, games of skill, such as chess, bridge, poker and blackjack, have attracted tournaments. Various types of tournaments have been created and attempted to satisfy the above mentioned needs. These tournaments involve games such as poker and blackjack. Typically, various rules have been placed upon the individual game. Examples of such attempts are described:

U.S. Pat. No. 5,660,392 to Hansen involves a method for playing a blackjack type card game having specific rules regarding the play of the game; U.S. Pat. No. 5,660,391 to Klasse involves a method for playing blackjack where a player wagers whether a hand will be a Blackjack, 21, 20, 19 or 18; U.S. Pat. No. 5,566,946 to Parker involves a method to play blackjack where different bets are placed on the Ante and the Play with different odds being placed on same.

U.S. Pat. No. 5,755,621 to Marks involves a poker card tournament where a player creates a poker hand by first receiving a pair of cards, discarding one of the card and repeating the process until the hand has been completed. This tournament is played solely between the player and the house computer system or between other players.

The prior art game of skill games or tournaments have not been successful. These references do not allow a player to gauge his level of performance by allowing the player to test his skill and ability against the tournament sponsor and other players during the same tournament. There is a need for a tournament which allows for a player to compete and obtain a reliable index as to his skill as compared to other competitors competing under the same game conditions while simultaneously enjoying the game.

## BRIEF SUMMARY OF THE INVENTION

In accordance with the present invention a game of skill tournament having a qualifying round and a playoff round,

2

being played over an interactive computer system, is disclosed. Generally, the qualifying round is played between a single player and a host computer. The playoff round is played between those players that have obtained a predetermined level of performance during the qualifying round. Awards are distributed to those players who reach specific levels of performance during the qualifying round and to the top scorers of the playoff round.

For purposes of the present invention, a game of skill is defined as any game where a player's knowledge and experience influences the outcome of the game. Examples of games of skill include but are not limited chess, poker, bridge, hearts, blackjack and question/answer trivia games.

The game of skill tournament is divided into two distinct portions: the qualifying round and the playoff round. The qualifying round is played between a single player through a computer terminal and a host computer. The host computer has the ability to act as a game sponsor by keeping score, operating the game, monitoring the player's progress and to distribute awards when appropriate. Also, the host computer has the ability to act as another player if the game requires more than a single player. The object of the qualifying round is to obtain a level of performance that will allow a player to participate in the playoff round. Awards are given to those players reaching various levels of performance during the qualifying round and to the top scorers during the playoff round.

With respect to the levels of performance, there are a plurality of levels ranging from low-performance to high-performance. Typically, there would be a low-performance level, one or more mid-performance levels and a high-performance level.

If a player obtains a result while playing a game of skill during the qualifying round which satisfies a predetermined criteria specific to a level of performance, the player would then be classified a player of that level and would be given an award specific to that level.

If a player obtains a result that qualifies him to be classed into a level of performance that qualifies him to be able to participate in the playoff round, he would be eligible to play the game of skill against the host computer in the playoff round. During the playoff round, all players which obtained a specific level of performance would simultaneously play the game of skill against the host computer under the same rules and conditions as during the qualifying round, except for a specific time limit. Typically, the levels of performance which qualify a player for the playoff round are the highest most levels.

After the time limit for the playoff round ends, the results are evaluated, with the players being ranked according to the number of point each obtained during the playoff round. Awards are distributed to those players reaching a predetermined ranking. For example, the winner, second place and third place players will each receive different awards.

The game of skill tournament can be played over an electronic system, such as a local area network (LAN), wide area network (WAN), campus-wide network, fixed based unit network, Intranet or Internet.

The primary object of the present invention is to create a game of skill tournament which improves upon the prior art tournaments.

Another object of the present invention is to create a game of skill tournament which challenges the participants and reward those participants who obtain a certain level of performance.

Other objects and a further scope of the applicability of the present invention will become apparent from the detailed

3

description to follow, taken in conjunction with the accompanying drawings wherein like parts are designated by like reference numerals.

## DESCRIPTION OF THE DRAWINGS

FIG. 1 is a flow chart of the preferred embodiment of the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

In accordance with an exemplary embodiment of the present invention as shown in FIG. 1, a method directed toward a game of skill tournament **10** having a qualifying round **20** and a playoff round **40** is generally disclosed. A least one player participates in the qualifying round **20** against a host computer. The playoff round **40** is played by those players that have obtained a predetermined level of performance during the qualifying round **20** against the host computer. Awards are distributed to those players who reach specific levels of performance during the qualifying round and to those players in the playoff round who obtain a predetermined rank. The awards can be distributed either instantaneous or can be made available to be received by the recipient at some time in future.

The game of skill tournament first begins with at least one player playing a game of skill against the host computer in the qualifying round **20** as shown in box **22**. The maximum number of participants during the qualifying round **20** is open-ended. The only restriction on the number of participants would be specific to the particular game of skill being played. The game of skill can be any game of skill that requires the player to utilize his knowledge and experience to affect the outcome of the game. Examples of games of skill include but are not limited to games, card games and strategy games. Card games can include: rummy, gin rummy, poker, bridge, pinochle, bezique, piquet, klaberjass, julepe, boure, cribbage, casino, euchre, napoleon, two hand five hundred, spoil five, ecarte, hearts, cans, seven-up, draw seven, auction pitch, blackjack, pontoon, fifteen, van john, seven and a half, ten and half, pong, maco, chemin de fer, baccarat, skin game, horse race, eights, sharnery, sharney gin, doctor videtti, tableanette, and solitaire. Trivia games can include games relating to: geography, history, motion pictures, science, the Bible, literature, fictional writings, nonfictional writings, musicians, writers, composers, actors, statesmen, military battles, military leaders, mathematical problems, mathematical formulas, fine arts, horticulture, agriculture, medicine, television shows, spelling, phrase origins, word origins, science-fiction, sporting events, athletics, anatomy and astronomy. Strategy games can include: crossword puzzles, word search, word scramble, word match, chess, maze games, computer-generated sporting games, player participation sports including but not limited to virtual sporting events, video sporting events and computer-based sporting events, player participation virtual reality games, player participation action games, dominos, checkers, pinball and foosball trivia.

The object of the qualifying round **20** is to obtain a sufficient number of points during the course of play which satisfies a predetermined criteria for a level of performance. Qualifying round **20** can be only a single game or a series of games. Once a player has obtained sufficient points which would classify him in the top most level of performance, the player would not have to continue with the game or games.

Once the player completes his play against the host computer, the results are analyzed, as shown in box **24**. The

4

results are compared to a predetermined list of levels of performance **60**, as shown in box **26**. If the results satisfy predetermined criteria, the player will be classified into the level of performance that matches his results, as shown in box **28**. If the player's results do not meet a minimum level of performance, the player will be eliminated from the tournament will be terminated, as shown in box **30**. If a player is classified into a level of performance, an award specific to the specific level of performance is distributed to the player, as shown in box **32**.

If a player is eliminated from the tournament, he has the ability to begin a new qualifying round. The reasons for beginning a new qualifying round include attempting to qualify for the minimum level of performance, qualifying for a higher level of performance and to receive additional rewards.

If a player is classified into a level of performance that would qualify him to participate in the playoff round **40**, the player will advance, as shown in box **34**. Typically, these qualifying levels of performance are reserved for the highest most levels of performance. If the player's level of performance does not meet the predetermined qualifying level of performance, the player will be eliminated from the tournament, as shown in box **38**. As mentioned above, the player would be able to begin a new qualifying round in order to attempt to reach a level of performance that would allow him to participate in the playoff round **40**.

Typically the qualifying round is played in a continuous manner. By this it is meant that the player selects the day and time in which to participate. The only limitations to this time frame is if the qualifying round is not active. An example of this is illustrated as follows: The tournament is open for qualifying round play from Monday at noon to Saturday at midnight. Any player would have the ability to participate in the qualifying round at the time of his choice as long as it was between the pre-established time frame.

The playoff round **40** will begin at a preset time with those player who have qualified by a specific cut-off date and time playing the game of skill against the host computer, as shown in box **42**. The playoff round will continue for a preset amount of time, as shown in step **43**. After the playoff round has concluded, the results are analyzed, as shown in step **46**. The results are analyzed to determine the each player's rank. The players are ranked according to performance, as shown in step **48**. An award is then distributed to those players which have reached a predetermined rank, as shown in step **50**. The tournament then end as shown in step **52**.

## EXAMPLE OF PREFERRED EMBODIMENT

An example of the preferred embodiment of the present invention is set forth below. The parameters of the example are for illustrative purposes only. They are not intended to limit the scope of the invention. The game of skill will be set as Hearts. The tournament will be played over the Internet, where the host computer and participants' terminals are each in different locations. The qualifying round is open for play seven days a week, twenty-four hours per day. The playoff round is to be played on each Saturday from 6 p.m. to 8 p.m. GMT. The playoff qualifying cutoff date and time is Saturday at noon, GMT.

The predetermined levels of performance are set out below in Table 1.

US 6,174,237 B1

5

TABLE 1

| Level | Minimum Points | Award |
|---|---|---|
| Bronze | 200 | X |
| Silver | 300 | 2X |
| Gold | 400 | 3X |
| Platinum | 500 | 4X |

Points are earned based on winning rounds of play. The qualifying levels of performance include the Gold and Platinum levels. Four players start the qualifying round against the host computer. Since the tournament is played over the Internet, each player is able to participate at a variety of locations at the time of their choosing prior to noon on Saturday.

The host computer is represented by a computer system having compatible hardware and software. The location of the host computer system can be a different location than those locations of each player. Through a series of two-way communications, the game of skill is conducted between the players and the host computer system.

After each player has completed the qualifying round, the results are analyzed. The results are listed in Table 2.

TABLE 2

| Player | Score | Classification | Award | Advance |
|---|---|---|---|---|
| A | 75 | None | None | No |
| B | 250 | Bronze | X | No |
| C | 400 | Gold | 3X | Yes |
| D | 525 | Platinum | 4X | Yes |

The results show Player A had 75 points, Player B had 250 points, Player C had 450 points and Player D had 525 points.

Player A does not satisfy the minimum level of performance. Thus, Player A is eliminated from the tournament. Player B meets the criteria for the Bronze level of performance. Player C meets the criteria for the Gold level of performance. Player D meets the criteria for the Platinum level of performance. Host computer system distributes level of performance specific awards to Players B, C and D. However, only players C and D advance to the playoff round against other qualified players of equal level.

At the predetermined time on Saturday, Player C then plays the game of skill in the playoff round against the host computer simultaneously with other Gold level players. Player D plays the game of skill in the playoff round against the host computer simultaneously with other Platinum level players. Host computer system analyzes the results the Gold and Platinum level playoff rounds. The players are then ranked according to their specific performance during the playoff round.

Assume Players C and D are ranked first and third in their respective divisions. Host computer would then distribute an award to Player C specific to his first place ranking in the Gold playoff round and an award to Player D specific to his third place ranking in the Platinum playoff round.

While the foregoing detailed description has described several embodiments of the method in accordance with the present invention, it is to be understood that the above description is illustrative only and not limiting of the disclosed invention. Thus, the invention is to be limited only by the claims as set forth below.

What is claimed:

1. A method of playing a game of skill tournament having a qualifying round and a playoff round, and played over an interactive computer system, said interactive computer system having a host computer system, a plurality of terminals computers and compatible software, said method comprising the following steps:

a. playing a game of skill in a qualifying round between a single player and the host computer;

b. evaluating the results of said qualifying round to determine if said player qualifies to be classified within a specific performance level from a plurality of performance levels ranging from a low performance level to a high performance level;

c. evaluating the results of said qualifying round to determine if said player qualifies to be classified within a qualifying performance level taken from said plurality of performance levels;

d. distributing to said player a performance level award, said performance level award being dependent upon the specific performance level obtained;

e. playing said game of skill in a playoff round between said player and the host computer simultaneously along with other players, wherein each player has been classified within a qualifying performance level;

f. evaluating the results of said playoff round to determine a tournament winner and subsequent ranking of players; and

g. distributing tournament awards to tournament participants.

2. The method of claim 1 wherein said interactive computer system is selected from the group consisting of a local area network (LAN), wide area network (WAN), campuswide network, fixed based unit network, Intranet or Internet.

3. The method of claim 1 wherein said qualifying round is defined as a plurality of individual games and the results of said qualifying round is an aggregate of the results of each individual game.

4. The method of claim 1 wherein said performance level award increases as a player qualifies for higher performance level classifications.

5. The method of claim 1 wherein said qualifying performance level as recited in subparagraph (d) is further defined as being the highest performance level.

6. The method of claim 1 wherein said plurality of performance levels is further defined as having four performance levels ranging from a low performance level to a medium-low performance level to a medium-high performance level to a high performance level.

7. The method of claim 6 wherein said qualifying performance level is further defined as being the medium-high and highest performance levels.

8. The method of claim 1 wherein said step (b) and step (c) are performed simultaneously.

9. The method of claim 1 wherein said game of skill is further defined as a card game requiring skill and knowledge.

10. The method of claim 9 wherein said card game is selected from the group consisting of rummy, gin rummy, poker, bridge, pinochle, bezique, piquet, klaberjass, julepe, boure, cribbage, casino, euchre, napoleon, two hand five hundred, spoil five, ecarte, hearts, cans, seven-up, draw seven, auction pitch, blackjack, pontoon, fifteen, van john, seven and a half, ten and a half, pong, maco, chemin de fer, baccarat, skin game, horse race, eights, sharnery, sharney gin, doctor videtti, tableanette, and solitaire.

11. The method of claim 1 wherein said game of skill is further defined as a question and answer game requiring skill and knowledge.

US 6,174,237 B1

7

**12**. The method of claim **11** wherein said trivia game is selected from the group consisting of geography, history, motion picture, science, bible, literature, fictional writings, nonfictional writings, musicians, writers, composers, actors, statesmen, military battles, military leaders, mathematical problems, mathematical formulas, fine arts, horticulture, agriculture, medicine, television shows, spelling, phrase origins, word origins, science-fiction, sporting events, athletics, anatomy and astronomy.

**13**. The method of claim **1** wherein said game of skill is further defined as a strategy game requiring skill and knowledge.

**14**. The method of claim **13** wherein said strategy game is selected from the group consisting of crosswords, word search, word scramble, word match, chess, maze games, computer generated sporting games, player participation sports including virtual sporting events, video sporting

8

events and computer based sporting events, player participation virtual reality games, player participation action games, dominos, checkers, pinball and foosball.

**15**. The method of claim **1** wherein said game of skill is based on the memory reaction of the player.

**16**. The method of claim **1** wherein said game of skill is based on the manual dexterity and reaction time of the player.

**17**. The method of claim **1** wherein said playoff round is played at a predetermined time and date.

**18**. The method of claim **1** wherein said playoff round is played for a predetermined amount of time.

**19**. The method of claim **1** wherein said player can participate in said qualifying round during a predetermined time frame.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 6,174,237 B1                                    Page 1 of 1
DATED         : January 16, 2001
INVENTOR(S)   : Stephenson

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Claims, page 5, column 6,
Line 2, after "terminals" insert --, --;
Line 63, change "sharnery" to -- skarney --;
Line 63, change "sharney" to -- skarney --.

Signed and Sealed this

Second Day of October, 2001

*Attest:*

*Nicholas P. Godici*

NICHOLAS P. GODICI
*Acting Director of the United States Patent and Trademark Office*

*Attesting Officer*

## PROOF OF SERVICE

I hereby certify that on April 24, 2015, a copy of the following documents:

- Brief of Patent Owner-Appellant John H. Stephenson

was filed electronically with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Counsel for Game Show Network, LLC and Worldwinner.com

Brenton R. Babcock
Ted M. Cannon
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, 14th Floor
Irvine, CA 92614
Tel.: (949) 760-0404
Fax: (949) 760-9502
Email: brent.babcock@Knobbe.com
Ted.cannon@Knobbe.com

/s/ Daniel W. McDonald
Daniel W. McDonald

## CERTIFICATE OF COMPLIANCE
## PURSUANT TO FEDERAL CIRCUIT RULE 32(a)

Certificate of Compliance with Type Volume Limitation, Typeface Requirements, and Type Style Requirements:

1. This brief complies with the type volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   - this brief contains 11,258 words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii)

2. This brief complies with the typeface requirements of the Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   - this brief has been prepared in a proportionally spaced typeface, using Microsoft Word 14 Times New Roman font.

Dated:  April 24, 2015          /s/ Daniel W. McDonald
                                Daniel W. McDonald
                                Thomas J. Leach
                                Rachel C. Hughey
                                Robert A. Kalinsky
                                MERCHANT & GOULD P.C.
                                3200 IDS Center
                                80 South Eighth Street
                                Minneapolis, MN 55120
                                Telephone:  612-332-5300
                                Facsimile:  612-332-9081